Argued 29 June, decided 31 July, 1905.

## CURTZE r. IRON DYKE MINING CO.

81 Pac. 815.

CONSTRUCTION OF POWER OF ATTORNEY TO MORTGAGE—RATIFICATION.

1. A power of attorney authorizing the agent to borrow money and secure the repayment thereof by mortgaging specified property in the hands of a receiver, but which the principals had arranged to buy, is broad enough to sustain a mortgage given for not only the purchase price but for money necessary to clear away outstanding liens against the title, it being evidently the intention of the principals to procure an unincumbered title, and the report of the agent having been promptly submitted and received without objection.

CONSTRUCTION OF VOTING TRUST CONTRACT.

2. A corporation was organized to purchase certain mining and railroad property subject to a mortgage, which the corporation assumed. A voting trust agreement was executed, which stipulated that 395,000 shares of the corporation's stock should be issued to one of the mortgagees as trustee, and that such shares should be voted by him for such directors as the trustee and certain others should jointly direct, and that the trustee or his successor should not vote to sell below par any of the 100,000 shares of the particular stock remaining in the treasury, and none of the parties should sell any of the shares held in trust without the written consent of the others until August 1, 1905, unless the mortgage and liens on the property should be sooner paid, and the treasury stock sold and paid for. The first draft of the trust agreement contained a provision extending the time for payment of the mortgage, but this was eliminated. *Held,* that such trust agreement did not effect an extension of the mortgage until the date specified for the termination of the trust.

MORTGAGE—USURY.

3. Where one of the owners of certain options on unpatented mining claims, being largely indebted to C. and two of his associates, among others, made a settlement with them, in which he agreed to pay $20,000 and one-tenth interest in such options conditionally on his being able to acquire title to the property, which amount should come out of the property, in order to induce C. and his associates to permit their attorney to act for him in the matter, and thereafter, when it became apparent that such owner would lose the property, and C. and his associates would get nothing by their settlement unless they could raise more money, they agreed with their other coplaintiffs that, if they would join in raising such additional money to clear the title, they would divide the amount, giving to them under the settlement pro rata, and the settlement agreement took place more than a year prior to the execution of the mortgage on the claims to secure the money raised, and the amount fixed by the settlement was not included in the mortgage, such agreement was insufficient to sustain a defense of usury.

AMOUNT DUE ON MORTGAGE—FACTS:

4. The testimony shows that the receiver's certificates which were included in the mortgage in question were the property of the mortgagee.

From Baker: ROBERT EAKIN, Judge.

Statement by MR. JUSTICE BEAN.

This is a suit by F. F. Curtze and others against the Iron Dyke Copper Mining Co. and others to foreclose a mortgage on certain mining property in Baker County and on a right of way for a railway from Huntington down Snake River to or near such property. The plaintiffs and the defendant Charles M. Reed are all residents of Erie, Pennsylvania. The defendant the

Iron Dyke Copper Mining Co. is a South Dakota corporation,
but its stockholders are residents of Erie, and its principal office
is in that city. The mortgage sought to be foreclosed was made
on the 19th day of February, 1902, in this State, by Louis Rosen-
zweig, as attorney in fact for the defendant Reed and one Charles
M. Warner, who were at that time the owners of the mortgaged
property. The mining property formerly belonged to the North-
west Copper Co., an Oregon corporation, and was sold under a
decree of the Circuit Court of the United States for the District
of Oregon, and bid in by Warner, as the agent of Reed, for
$85,000, he paying $10,000 in cash at the time of his bid. The
decree for the sale provided that the settlement of the accounts
of the receiver theretofore appointed in the suit should be re-
served for further adjudication, and that until the purchaser
should be put in possession after a confirmation and conveyance
to him, the receiver should remain in possession, preserve and pro-
tect the property, and comply with the provisions of the leases and
options under which the copper company held the mining prop-
erty, and to that end he might from time to time borrow money
and issue receiver's notes and certificates for such amounts as
might be necessary to make any payments falling due upon such
options and to carry on the work of the mine. The railway prop-
erty formerly belonged to the Northwest Railway Co., an Oregon
corporation, and was bid in by the defendant Reed at a sale under
a decree of the United States court for $35,000, $5,000 of which
was paid at the time. Both the copper company and the railway
company were corporations promoted and attempted to be financed
by Reed, but, as he was unable to keep them afloat, he brought a
suit in the United States circuit court for the District of Oregon
in August, 1899, for the appointment of a receiver and the sale
of the property, and the sales heretofore referred to were made
in pursuance of decrees rendered therein. The assets of the
mining company at the time the suit was begun by Reed con-
sisted principally in options to purchase unpatented mining
claims. In order to preserve such options and meet the payments
thereon as they became due, the receiver, by order of the court,
issued and sold a large amount of receiver's certificates, but was
unable to raise sufficient money for the purpose, and in January,

1901, Reed borrowed of the plaintiff Conrad $20,000 with which to take up one of the options. Of the money so borrowed of the plaintiff $18,400 was paid to the First National Bank of Baker City, and a deed for the mining property held in escrow by the bank was by the consent of Reed and the receiver delivered to Conrad as security for the money so borrowed. The balance of the $20,000 was paid to the receiver to meet the monthly pay rolls, except $100, which was used by Reed's attorney for personal expenses incident to the trip to Oregon from Pennsylvania to attend to the business. On February 1, 1901, at the request and solicitation of Reed, the plaintiffs advanced for the purpose of paying the balance due on the bids of himself and Warner and the expenses of the receivership, so that title could be obtained to the mining and railway properties, the sum of $100,000 in cash and $46,188.96 in receiver's certificates. The money and the receiver's certificates were delivered to Mr. Rosenzweig, of Erie, Pa., who was the attorney for all the parties, and who was given at the time a power of attorney by Reed and Warner, authorizing him to mortgage the property acquired by them through the sales under the decrees of the United States court. Mr. Rosenzweig came to Oregon, settled up the receivership, paid to the parties interested and to the clerk of the court the amount necessary to secure deeds to Warner and Reed for the property bid in by them. He caused these deeds to be placed of record in Baker County on the 18th of February, 1902, and on the next day executed the mortgage now in suit to secure the payment of the $100,000 advanced by the plaintiffs on February 1st, the $20,000 previously borrowed of Conrad, and the $46,188.96 of receiver's certificates which had been by him turned in as cash, making a total of $166,188.96; the respective amounts due and payable to each of the parties being specified in the mortgage. At the time the power of attorney was given by Reed and Warner to Rosenzweig, they executed a deed to the plaintiffs for an undivided one tenth of all the property they should thereafter acquire through their purchase at the master's sales under the decrees of the federal court. On April 2, 1902, Warner conveyed by deed the remaining nine tenths to Reed, and on April 7, 1902, Reed and the plaintiffs by a joint deed conveyed all the property to the

defendant the Iron Dyke Copper Mining Co., which had been organized by Reed, or under his direction, to take the title. The deeds from Warner and from Reed and the plaintiffs to the mining company were each made subsequent to the mortgage in favor of the plaintiffs, and the grantees therein expressly assumed and agreed to pay such mortgage as a part of the purchase price. But, default being made in the payment, this suit was instituted. Answers were filed on behalf of Reed and the Iron Dyke Copper Mining Co., setting up practically four defenses: First, that the mortgage, as executed, was not within the power or authority conferred upon Rosenzweig by the power of attorney from Reed and Warner to him; second, that the time of the payment of the mortgage had been extended by a subsequent agreement between the parties; third, that the contract for the loan by the plaintiffs to the defendants is usurious; and, fourth, that the amount stated in the mortgage is in excess of that actually due the plaintiffs.        AFFIRMED.

For appellants there was a brief over the names of *Williams, Wood & Linthicum,* and *Emmet Callahan (M. O. Reed,* of counsel), with an oral argument by *Mr. Charles Erskine Scott Wood.*

For respondents there was a brief and an oral argument by *Mr. John Langdon Rand.*

MR. JUSTICE BEAN delivered the opinion of the court.

1. The power of attorney from Warner and Reed to Rosenzweig, and under which the mortgage in suit was executed, authorized him for and in the name of his principals "to acquire a loan of money, not to exceed $200,000, and, for the purpose of securing the lender or lenders of said money, to grant, bargain, sell, convey, and mortgage unto the said lender or lenders" the mining and railway property to be acquired by them under their purchases at master's sales pursuant to the decrees of the United States circuit court in the suits brought by Reed against the Northwest Copper Co. and the Northwest Railway Co. It is contended that this power of attorney is a limited or special grant of power to borrow money, and did not authorize Rosenzweig to include in the mortgage executed by him previously

existing debts against the receiver, or liens on the property, although their extinguishment was necessary in order to vest the title in Reed and Warner. The condition of the title and the situation of the parties at the time the power of attorney was executed, and the object to be accomplished by it, show clearly that it was intended to enable Rosenzweig to mortgage the property for sufficient to clear the title. Reed and Warner had bid in the property, but had not been able to pay the purchase price. They were anxious to close up the transaction and secure title. To do this it was necessary to meet the balance due on their bids and take care of the expenses of the receivership and the $20,000 previously borrowed of Conrad, and for the security of which he held a deed to a part of the property.

After protracted negotiations, it was finally agreed between Reed and the plaintiffs that the latter would advance for the purpose stated $100,000 in cash, and the plaintiff Curtze, who held in his own right and as the representative of a local bank $46,188.96 in receiver's certificates, would surrender them up for cancellation, and take a mortgage on the property in his favor to secure the payment thereof, and that the plaintiff Conrad would surrender his lien and take a mortgage in lieu thereof. It was mutually agreed that Rosenzweig should come to Oregon and act for and represent all the parties interested in closing up the transaction. It was in pursuance of these arrangements that the money and receiver's certificates were delivered to him by the plaintiffs and the power of attorney given by Reed and Warner. It is therefore quite probable that the mortgage as executed was within the power conferred. The power to borrow money and secure the same by mortgage for the purpose of paying certain obligations would, it seems, include the power to satisfy and discharge such indebtedness by arranging with the holders thereof to postpone the time of payment and accept security therefor by mortgage. But, however that may be, as an original proposition it is not important here. The mortgage as executed was manifestly given in pursuance of the understanding and agreement of all the parties, and it accomplished the purpose intended. Immediately after Mr. Rosenzweig returned to Pennsylvania he made a written report to the parties inter-

ested, giving in detail and at length a statement of his transactions, including the execution of the mortgage, the amounts of money received and expended by him, from whom received and to whom paid, and no objection was made thereto by any one until after this suit was commenced. The objection now made, therefore, that the mortgage was not strictly within the terms of the power, should not prevail.

2. On the 5th of August, 1902—two days before the mortgaged property was conveyed to the defendant corporation—the owners thereof, being the plaintiffs and the defendant Reed and one Mrs. Shatto, who claims an interest therein, entered into a written agreement, which agreement, after reciting that the parties thereto were willing to accept the offer of the mining company to purchase the property subject to the mortgage and other liens thereon for $4,000,000 of its capital stock, stipulated that 395,000 shares of such stock should be issued by the corporation to the plaintiff F. F. Curtze, as trustee, and 5,000 shares to the defendant Reed, or whoever he might direct; and the shares issued to Curtze should be voted by him for such directors of the corporation as himself, Reed, Conrad, Fink and Sproul, who represented Mrs. Shatto, should jointly direct. It was further stipulated that the trustee or his successor should not vote to sell below par any of the 100,000 shares of the capital stock of the company remaining in the treasury, and that during the continuance of the agreement none of the parties should sell or assign any part of the shares held in trust by Curtze without the consent in writing of all the others. This agreement, by its terms, was to continue irrevocably until August 1, 1905, unless the mortgage and liens on the property and the indebtedness of the company were in the mean time paid, and the treasury stock sold and paid for. At the termination of the agreement the shares issued to Curtze should be divided among the subscribers in certain specified amounts.

Now it is contended that this agreement, which was, in effect, a mere voting trust or pooling arrangement, operated in some way to postpone the payment of the mortgage to the plaintiffs until August 1, 1905, unless a sufficient amount of the stock of the defendant corporation was sold in the mean time to pay

the same.  It was the evident purpose of the agreement to vest
the title of the stock to which the subscribers were entitled in a
trustee, so as to facilitate the management of the corporation, to
protect the rights of interested parties, and to expedite the sale
of the treasury stock, and it was no doubt thought at the time
that money could be promptly raised by the sale of such stock
with which to pay the indebtedness, including the plaintiffs'
mortgage.  But there is no provision in the agreement which
can be construed as extending the time for the payment of the
mortgage, and that such was not the intention of the parties is
evident from the fact that the first draft of the pooling or trust
agreement contained such a provision; but it was eliminated
because some of the parties refused to agree to an extension.
There is nothing, therefore, in this point even if the defense
that the suit is prematurely brought was not waived by joining
it with an answer to the merits: *Hopwood* v. *Patterson,* 2 Or. 49.

3.  It is contended that the loan to secure which the mortgage
was given was usurious.  The answer avers that, in addition to
the stipulated interest, the borrowers agreed to pay to the plain-
tiffs, as a bonus for such loan, $20,000 in cash and one tenth of
the mortgaged property.  This averment is denied by the plain-
tiffs, and upon the issue thus joined there is a conflict in the
testimony.  But the decided weight of the evidence is, in our
opinion, with the plaintiffs, and supports the findings of the
trial judge.  Mr. Rosenzweig, an attorney in good standing at
the bar, and evidently a man of credit and respectability, who
arranged the loan and is familiar with the entire transaction,
says that more than a year before the loan was made he was em-
ployed by the plaintiffs Curtze, Fink and Metcalf to represent
them in the matter of a claim they asserted against Reed and
the property then in the hands of the receiver in Oregon, and for
that purpose came to Oregon to investigate the situation.  Soon
after his return home, Reed desired to retain him to assist in
extricating him (Reed) from his financial difficulty, and what
occurred is thus related by the witness:

"Mr. Reed and Mr. Conrad came to my office, stating that Mr.
Reed desired to employ me. I said that I was tied up to these other
people, and that they would have to adjust the matter with them
before I could be released.  It was suggested that Mr. Curtze

be sent for, and after phoning for him or sending for him we talked it over, and then Mr. Curtze was directed to see Mr. Fink and Mr. Metcalf, and he came back and stated to me, of which I informed Mr. Reed, that they would not release me; that Reed had got them into trouble, and that they did not purpose, after they had expended money in educating a man in the conditions out here, that Reed should have the benefit of it. After several conversations we got down to an agreement, by which it was agreed that I was to be free to represent Reed in his western matters on condition that he would give a note for the amount of money that they had expended in prosecuting their claim, less $500 of my fees, and $20,000 and a one-tenth interest conditionally upon Mr. Reed's acquiring title to the property, and to come out of the property. At the time Reed did not have title to the property. It was in jeopardy. There was a controversy in the United States court. It was a doubtful title at the best.

"After these parties, the present plaintiffs, proposed this large loan, Fink and Metcalf claimed this entire amount as their settlement. I told them it would only make a controversy between the parties they borrowed the money from, and I did not want to be a party to that, or have any more controversy between them, and whatever they agreed upon was to be divided pro rata among them. Fink, Curtze and Metcalf were to realize on their respective claims pro rata with the other people. In other words, the $20,000 coming to Fink, Curtze and Metcalf, as originally intended, and the one-tenth interest, I divided up in proportion to every man's interest who furnished the money, so as to put them on an equality. This $20,000 and the interest in the property was not offered by Reed or accepted by the plaintiffs as an inducement to make the loan, nor was it intended as a bonus for that purpose. It was to induce these people to let me act for Reed in these western propositions, and was contingent upon his getting title. It was called a bonus to protect Reed. There was some $100,000 in other claims in the same condition as those adjusted, and if the people had known the situation they would have employed some lawyers to do just exactly what I did, and compel Mr. Reed to sell or make a settlement. It was a condition that was dangerous, as I believed at the time, to Mr. Reed. The amount was called a bonus in the different dealings between the parties to cover up the situation from other people who had expended money the same as Metcalf, Fink and Curtze, and to prevent the knowledge that there had been a settlement or adjustment with them, and because Mr. Reed did not want Mrs. Shatto to know that he had made a settlement with Fink, Metcalf and Curtze. No part of the $20,000 promised to be paid

by Reed to Fink, Metcalf and Curtze is included in the mortgage."

This testimony of Rosenzweig is corroborated by Curtze, Metcalf, Conrad and Fink, and is no doubt a true statement of the actual facts. Reed has a different version of the affair, and tries to make it appear that the $20,000 and the one-tenth interest in the property were given and received as a premium for making the loan; but his testimony is halting and evasive, and is not sufficient to overcome that of the plaintiffs. The reference to the matter as a bonus in the statement of Reed to his creditors in the bankruptcy proceeding and in the other transactions between the parties was, as Mr. Rosenzweig stated, for the purpose of keeping the knowledge of the true situation of Reed's affairs from the creditors similarly situated. The transaction by which it is alleged the plaintiffs acquired a one-tenth interest in the mortgaged property and a promise for the payment of $20,000 in cash when realized from the property was merely the result of an adjustment between Curtze, Fink and Metcalf on the one hand and Reed on the other of an alleged loss sustained by the former in some previous financial venture with Reed, and had no connection whatever with the loan. At the time of this settlement Reed had no title to the property. Everything was contingent upon the result of the suit then pending in the federal court. The ownership of the property was in the original parties, subject to the options of the mining company to purchase it. To meet these options, large amounts of money were required, which Reed was having difficulty in securing. To have Metcalf, Fink and Curtze intervene in the suit then pending in the federal court, as they were threatening to do, and attempt to assert their claims, would have complicated matters, and increased the difficulty of Reed's carrying out his plans. To adjust these claims and prevent such a complication, and to secure the services of Mr. Rosenzweig, who seems to have been the attorney for large moneyed interests, was the motive for the settlement. It took place more than a year before the mortgage in suit was made, and had no connection whatever with such mortgage. The $20,000 agreed to be paid by Reed to Metcalf, Fink and Curtze has never been paid. It was not included in the mortgage, but

is a separate and distinct transaction. When it became apparent that Reed would lose the property and Metcalf, Fink and Curtze get nothing on their settlement unless he could raise money sufficient to pay the balance due on his bids and the expenses of the receivership, Fink, Curtze and Metcalf agreed with their co-plaintiffs that if they would join them in raising money with which to clear the title they would divide the amount coming to them under the settlement with Reed. This arrangement was entirely between them. Reed had nothing to do with it, and had no interest in it. The amount thus agreed to be divided was not paid or received from Reed as a consideration for the loan, nor for the purpose of avoiding the usury law. Assuming, therefore, that the defendants in this suit are in a position to make the defense of usury, we are satisfied that it is not sustained by the testimony.

4. The point that the mortgage is for more than was actually due plaintiffs is based on the contention that a part of the receiver's certificates turned in as cash on the bids of Reed and Warner for the mining and railway properties and included in the mortgage were held by the plaintiff Curtze as collateral security for a loan made by him to Reed, and should not have been included in the mortgage. There were three lots of certificates surrendered to the federal court for cancellation by Mr. Rosenzweig at the time the property was taken from the hands of the receiver—one for $8,500, one for $4,912.50, and one for $26,445 —which, with accrued interest, amounted in the aggregate to $46,188.96. The first lot was sold by the receiver directly to Curtze, and was, of course, his property. The second was sold by the receiver to the Erie Dime Savings & Trust Co., and was its property. The third was issued originally to Reed, and was deposited by him with Curtze as collateral security for money advanced from time to time. On October 15, 1901, the amount of the loan being in excess of the face of the certificates, Reed sold and transferred the certificates in writing to Curtze absolutely, and with the right "to collect the entire amounts for his own use and benefit." Since that time the certificates have in all the dealings of the parties been considered, treated and deemed as the property of Curtze, and no question has been raised in

reference thereto by Reed, or any one else, until this suit was commenced.

The decree should be affirmed.                    AFFIRMED.