Argued January 9, affirmed July 16, 1958

# KNEELAND *v.* SHROYER

328 P. 2d 753

*Edward A. Butler,* Eugene, and *Harry G. Spencer,* Salem, argued the cause for appellant. With Spencer on the brief were Harris, Butler & Husk and Vernon D. Gleaves, Eugene.

*Orval N. Thompson* argued the cause for respondent. On the brief were Weatherford & Thompson, Albany.

Before PERRY, Chief Justice, and LUSK, WARNER and KESTER*, Justices.

---

* Resigned March 1, 1958.

LUSK, J.

This is an action to recover a commission or finder's fee based on a written agreement which called for payment to the plaintiff by the defendants, George Shroyer and Kenneth O. Watkins, of $50,000. Under the terms of the agreement only a first payment of $25,000 was due at the time this action was commenced. Recovery of that amount was sought, and in a jury trial a verdict for the amount prayed for was returned against the defendant Shroyer. Watkins was exonerated. Shroyer (hereinafter referred to at times as the defendant) has appealed from the consequent judgment.

The agreement sued upon was signed by Watkins purporting to act for himself and Shroyer. The latter contends that Watkins had no such authority and assigns this as one of the grounds of a motion for a directed verdict, which the court denied. A full statement of the evidence, therefore, becomes necessary.

The plaintiff, Millen F. Kneeland, is a real estate broker, duly licensed under the laws of this state, doing business under the assumed name of Tonquin Realty Company. During the period with which the case is concerned Mrs. Ida Mae Wolfe was employed by the plaintiff as a real estate broker and salesman. She was duly licensed to act in those capacities. For about two years prior to May 10, 1954, Mrs. Wolfe had been endeavoring to effect a sale of the assets of Blue River Sawmills, Ltd. (hereinafter called Blue River), a corporation of the province of British Columbia, all the stock in which, except three shares, was owned by W. H. L. Jones, of Victoria, B. C. The principal assets of the corporation consisted of what are described as private perpetual licenses for the cutting of timber on approximately 50 limits (a limit

is approximately a section) of land in British Columbia. Mrs. Wolfe had made 17 or 18 trips to the property, had taken some 47 people there, and discussed the matter with probably 150 people.

On March 1, 1954, in Vancouver, B. C., Mr. Jones signed and delivered to Mrs. Wolfe a writing addressed to Tonquin Realty Company in which he agreed to pay to the plaintiff a commission of $50,000, in the event of a sale of Blue River satisfactory to Jones in the year 1954 to any person whose name appeared in a list of prospective purchasers attached to such agreement, or to a company or corporation in which any such prospective purchasers might be financially interested, and including any associates they might bring into the purchase. Cecil Ford was one of the men whose name appeared on this list and whom Mrs. Wolfe had taken to see the property. About the middle of March 1954 Mr. Ford introduced the defendant, Kenneth O. Watkins, to Mrs. Wolfe at her home in Portland. Watkins informed Mrs. Wolfe that his business was finding timber for Mr. George Shroyer, and that he was paid 50 cents a thousand for timber which he found and Shroyer bought. They discussed the Blue River timber, and Mrs. Wolfe showed Watkins a prospectus that had been prepared by Jones, a cruise of the timber, and aerial photographs which she had had made. They arranged to meet in Vancouver, B. C., prior to going up into the timber. On March 31 or April 1, 1954, Mrs. Wolfe met Watkins at the Vancouver Hotel in Vancouver, B. C. He told her that he wished to go to see the timber alone. She showed him Jones' agreement to pay the plaintiff a commission of $50,000. Watkins went to his room and telephoned to H. R. McIntyre, of Victoria, B. C., who was Jones' attorney-in-fact, and received from

McIntyre confirmation that Jones had committed himself to pay Kneeland a $50,000 commission on the sale of the Blue River assets. Thereupon Watkins brought back and delivered to Mrs. Wolfe a signed agreement reading as follows:

"Vancouver, B. C.
April 1st, 1954

"Tonquin Realty Company
604 American Bank Bldg.,
Portland, Oregon

Attention: Ida M. Wolfe

"Gentlemen:

"If we buy the assets of the Blue River Sawmills Limited at any price which may be negotiated, we will pay to you a commission or Finder's fee of $50,000.00 to be paid as follows:

"One-half when the final papers are signed and the

"Balance in two equal annual instalments.

"Very truly yours,
"Kenneth O. Watkins
"George Shroyer
"By KENNETH O. WATKINS
"Kenneth O. Watkins"

It is this agreement upon which this action is based. Watkins typed in his own name and Shroyer's and signed the agreement for both. According to Watkins' testimony, Mrs. Wolfe had suggested such an agreement the night before.

Four or five days later, on his return to Vancouver from inspecting the timber, Watkins met Mrs. Wolfe and expressed enthusiasm about the timber and said that he thought Shroyer would buy it, and "he again told me," as Mrs. Wolfe testified, "that they would want to make their own negotiations." Mrs. Wolfe

had previously been furnished by Jones with a list of creditors of Blue River together with the amounts owing them, and had endeavored to bring about some reductions in their claims. At this meeting Watkins told her to stay away from the creditors, that they preferred to do it themselves.

On the same day that Watkins signed the agreement which he gave to Mrs. Wolfe the latter executed and delivered to Frederick J. G. Johnson at Vancouver, B. C., the following writing:

"April 1, 1954

"To

"Frederick J. G. Johnson:

"Providing a sale is consummated between, Ken Watkins and/or George Shroyer and Tonquin Realty Co, I agree to pay $5,000.00 out of closing moneys received to, F. J. G. Johnson for professional assistance rendered.

"Tonquin Realty Co.
"by Ida Mae Wolfe"

Mr. Johnson in his testimony described his occupation as that of a consulting forester, and the services for which Mrs. Wolfe agreed to pay him $5,000 seem to have been of a technical nature to aid Mrs. Wolfe in effecting a sale of the Blue River assets.

About the middle of April Shroyer and Watkins made a trip to the Blue River property and spent three days looking over the timber.

Under date of April 22, 1954, the plaintiff wrote a letter to McIntyre, Jones and one George Leith (Jones' bookkeeper) from which we quote the following paragraph:

"We have heretofore orally discussed the fact that we have an agreement with Shroyer and Watkins regarding the payment by them to us of the commission and their offer to you will be a net

offer without considering commissions. At the time of closing we will execute proper releases and agreements to cover a release of you from liability for commission upon having received from them appropriate payments."

The next episode concerns the exchange of the following telegrams:

"1954 May 4 AM 9 07
"PHILOMATH ORG
"M R MCINTYRE
"MCILREE AND MCINTYRE
"620 VIEW ST VICTORIA

"I OFFER EIGHTY FIVE THOUSAND DOLLARS FOR ALL STOCK IN BLUE RIVER SAWMILLS LTD ONE HALF TO BE PAID IN FIFTY FOUR ONE HALF FIFTY FIVE WITH SOME PAYMENT WHEN CONTRACT SIGNED WILL APPRECIATE WIRE ACCEPTING OFFER WILL BE VICTORIA NEXT MONDAY TO MAKE CONTRACT

"GEORGE SHROYER"

"May 4, 1954

"MR. KENNETH WATKINS
"1565 BROOK LANE

"CORVALLIS OREGON TELEPHONE 3-4793
"YOUR OFFER AS PER TELEGRAM MAY 4 ACCEPTED SUBJECT TO COMPLETION OF ALL ARRANGEMENTS BY MONDAY MAY 10 TERMS $85,000.00 TO JONES FIFTY PER CENT IN 1954 AND FIFTY PER CENT IN 1955 PURCHASER TO ASSUME TIMBER CONTRACTS AND PAY COMMISSION TO TONQUIN REALTY PURCHASER TO PAY CREDITORS OF COMPANY GUARANTEED NOT TO EXCEED $76,000.00 NET ANY SAVING BELOW THAT SUM TO BE CREDITED TO PURCHASER LETTER FOLLOWS

"(signed) W. R. McINTYRE"

The evidence concerning these telegrams is as follows: Shroyer's home was in Philomath, Watkins' in Corvallis. On the morning of May 4 Watkins went to Shroyer's home, told him that someone else was interested in the timber, and that there was need to act promptly. Watkins testified that he telephoned from Shroyer's home to McIntyre in Victoria, and had two lengthy conversations with him. He doubted whether the commission was discussed over the telephone, and said that "the only point of bickering there was whether they were going to make concessions, which they finally made." After discussing the matter with Shroyer, they agreed on the terms of an offer, and Shroyer told him to send a telegram. Watkins then telephoned the message to the telegraph office. Shroyer was not in the room from which he telephoned and did not hear him. While this telegram was sent over Shroyer's name, the answer from McIntyre, it will be noticed, was addressed to Watkins at his home in Corvallis and his telephone number was added. It is a reasonable inference that Watkins had suggested to McIntyre in his conversation over the telephone that this be done. The McIntyre telegram was delivered to Watkins at his home in Corvallis, and, according to the latter's testimony, he notified Shroyer over the telephone that "the offer had been accepted." He did not, he swore, read the telegram to Shroyer.

Shroyer testified that he told Watkins to send a telegram, but did not tell him what to put in it. He also testified that Watkins did not put in the telegram what he told him; that he told him to see what kind of a deal he could make. Finally, he conceded that he agreed to the amount of the offer stated in the telegram, but there was one mistake, that is, the telegram said "stock" in the corporation and he knew

nothing about stock. His testimony agrees with Watkins' that the latter called him in the evening and advised him that the offer had been accepted, but that Watkins did not read the telegram to him. Watkins then left for Vancouver, and Shroyer arrived in Vancouver on May 9, the day before the deal with Jones was closed.

On May 6 or 7 Kneeland and Mrs. Wolfe met Watkins at the Portland airport. Watkins was enroute to British Columbia. He informed them that the deal would be closed on May 10, and that he and Shroyer wanted Kneeland to be there to assist in closing it. He told them, according to Kneeland's testimony, that "he had been discussing the commission with Mr. Shroyer and that Mr. Shroyer didn't want to pay the commission on the terms that had been agreed upon but that he would pay it on the basis of fifteen thousand dollars down at the time that the deal was closed, ten thousand dollars in ninety days, twelve thousand five hundred dollars in one year and seven thousand five hundred in two years, and that they would pay the five thousand dollars that was due from us to Mr. Johnson." Kneeland told Watkins they would agree to the change. This testimony stands uncontradicted.

On May 10 the purchase of all the stock of Blue River by Shroyer and his wife was completed in the office of Jones' attorney, Percy Hamilton Read, a barrister and solicitor, in Vancouver, B. C. By agreement of the parties Mr. Read acted for both sides. Besides Read, Jones, and Mr. and Mrs. Shroyer, there were present McIntyre, Watkins, Leith and Johnson. Most of the day was taken in working out the details of the agreement, which was not executed until about a quarter to ten at night.

The signed contract, consisting of six pages and a schedule of creditors, contains the following provision:

"AND THIS AGREEMENT FURTHER WITNESSETH that the Purchasers hereby covenant and agree with the Vendor to indemnify and save harmless the Vendor and his estate and effects and also the said Cecil Thomas Jones his estate and effects of and from all claims and demands whatsoever in respect of commission, brokerage and/or for services rendered in connection with the sale by the Vendor and the said Cecil Thomas Jones to the Purchasers of the said shares in the Company and in connection with the entering by the Vendor and the said Cecil Thomas Jones into this Agreement and so that in the event of any claim being made by either Ida Mae Wolfe and/or Millen F. Kneeland and/or Tonquin Realty all of Portland in the State of Oregon one of the United States of America the Purchasers will take all steps necessary to deal with such claim and to defend any legal proceedings brought by the said parties or any or either of them against the Vendor and the said Cecil Thomas Jones hereby covenant with the purchasers to give notice forthwith of any claim made by the said parties for commission, brokerage and/or services as hereinbefore mentioned."

Kneeland and Mrs. Wolfe went to Vancouver on May 10 in accordance with Watkins' suggestion. They were admitted into the office of Mr. Read about 5:00 o'clock in the afternoon. All the persons above mentioned were there. Neither Kneeland nor Mrs. Wolfe had ever before seen Shroyer, although they had once gone to Corvallis to meet him, but on their arrival there were told by Watkins that Shroyer was sick and unable to see them. Disregarding conflicts in the testimony—with which we are not concerned—there was evidence that when Kneeland and Mrs. Wolfe were admitted into Read's office the question of the plain-

tiff's right to a commission was brought up by Read; that the two agreements for the payment to the plaintiff of $50,000 and the two telegrams of May 4, 1954, were read aloud in the hearing of all those in the room, including Shroyer.

After the agreement of Jones to pay a commission was read Mr. Read said that he did not see how Shroyer and Watkins were connected with the instrument, whereupon the list of prospective purchasers attached to the agreement, which included the name of Cecil Ford, was read, and following that a letter dated March 30, 1954, written by Mrs. Wolfe to Jones was read. The purpose of this letter was to notify Jones that Tonquin Realty Company had contacted a number of additional persons as prospective purchasers, including Watkins and Shroyer. The letter concluded:

> "These names are furnished to you in accordance with our agreement to keep you advised as to people with whom we are discussing the sale of Blue River property in order that if they come to you indirectly you will according to your agreement inform and protect us."

It will be recalled that it was Cecil Ford who introduced Watkins to Mrs. Wolfe.

Johnson said that he had a contract with Kneeland, which has been set forth above, and which he read to the meeting. He also stated that he had an agreement from Shroyer and Watkins "by which they have assumed and agreed to pay this $5,000 direct to me," and Watkins said, "Yes, that's right." Read asked Johnson if it was satisfactory to him to look to Shroyer and Watkins for his fee, and he answered that it was. In answer to a question from Read, Kneeland said that

he was claiming but one commission, that he was looking first to Shroyer and Watkins, and that, if they should not pay or if he was unable to collect from them, then he was looking to Jones. Read told Jones that his advice was that he did not owe any commission, and added, "What Mr. Shroyer wants to do about it is up to him." There ensued what appears to have been a heated discussion, which terminated when Read ordered Kneeland and Mrs. Wolfe to get out of the office and never come back, whereupon they left. During this entire discussion Shroyer remained silent.

Subsequently, on his return to Portland, Kneeland telephoned to Shroyer and asked him what he was going to do about the commission, and Shroyer answered that he had put the matter in the hands of his attorney and added, "Well, Mr. Watkins' authority was not in writing."

With reference to the relationship between Watkins and himself, Shroyer testified that Watkins was a "timber scout," i.e., one who finds timber for another; that he did not find timber exclusively for Shroyer; although under their arrangement Watkins would first present the opportunity to Shroyer, and, if he turned it down, he would then take it to others. When timber found by Watkins was purchased by Shroyer the former received for his services 50 cents a thousand as the timber was cut up to two hundred million feet. That was the agreement in the present instance, and there had been similar agreements previously. They had also been associated in mining deals.

Shroyer denied that he had ever authorized Watkins to buy any timber in his name, or that he had ever heard that Mrs. Wolfe and the plaintiff were claiming a commission from him, instead of from Jones, until the day the deal was closed, May 10, 1954.

Shroyer's explanation of his reason for agreeing to protect Jones against the claim of the plaintiff for the payment of a commission was as follows:

"Well, if he'd give Mrs. Wolfe this here agreement, she was to get a commission on it, and when she collected it why we was informed that she could not collect anything in Canada, but he [Jones] wanted to be sure that he was protected if she did."

Watkins, called as an adverse witness by the plaintiff, was cross-examined at length regarding the reason for including in the contract between Jones and Mr. and Mrs. Shroyer the agreement to indemnify Jones against the claim of the plaintiff for a commission. His testimony leaves little if any doubt that there was a deduction of $50,000 from the purchase price because of that agreement. He testified: "Basically, the price had been reduced because we had taken over that obligation." While denying that Shroyer knew he had signed the agreement to pay a commission of $50,000 to the plaintiff, he conceded that at the time he talked to McIntyre by telephone from Shroyer's house, "Mr. Shroyer definitely knew that there had been discussion regarding him paying the commission if one was due for [sic] Jones. There was discussions that Shroyer would protect Jones against commission from Kneeland and Wolfe."

Before discussing the first assignment of error, based on the court's denial of defendant's motion for a directed verdict, we will advert briefly to the complaint. That pleading sets forth at some length the history of the transaction, beginning with the agreement between Jones and the plaintiff. It is then alleged that the defendants were advised of the terms of that agreement, and that "in consideration of said plaintiff's agreement to permit them to negotiate personally

for the sale of said capital stock of said corporation" the agreement of April 1, 1954, was signed by Watkins and delivered to the plaintiff, and that the defendants did negotiate with Blue River, that Shroyer and his wife entered into the contract of May 10, 1954, for the purchase of all the capital stock of the corporation, and that the sum of $25,000 thereupon became due to the plaintiff.

The foregoing is the gist of the complaint. As we understand the case, it is simply an action to recover moneys due to the plaintiff under the terms of the agreement signed by Watkins on April 1, 1954, and we think it unnecessary, therefore, to follow counsel for the defendant Shroyer in their suggestions that plaintiff may be seeking to recover upon an original agreement to answer for Jones' obligation to plaintiff, or upon a collateral agreement so to answer, or upon some theory of novation. We regard the allegations with respect to the plaintiff's agreement with Jones as matter of inducement merely. The making of the agreement of April 1, 1954, the consideration therefor, and the happening of the event upon which defendant Shroyer's liability should arise, are all clearly established by the evidence. The principal questions with which we are here concerned are those regarding the statute of frauds and Watkins' authority to act for Shroyer, raised by the motion for a directed verdict.

*The Statute of Frauds*

(1) The defendant says that the promise to pay the plaintiff $50,000 as a commission or finder's fee was not to be performed within a year from its making, and that, although the agreement is in writing, it fails

to express the consideration as required by ORS 41.580 and is void.[1]

The consideration for the fee or commission to be paid, as alleged in the complaint, was "plaintiff's agreement to permit them [the defendants] to negotiate for the sale of said capital stock of said corporation," and this consideration does not appear in the writing either expressly or by necessary implication. *Pioneer Show Etc. Co. v. Zetosh,* 96 Or 194, 189 P 644; *The Oregon Home Builders v. Crowley,* 87 Or 517, 170 P 718, 171 P 214; *Great Western Land Co. v. Waite,* 87 Or 488, 168 P 927, 171 P 193. If, therefore, the agreement is within the statute of frauds, plaintiff's action must fail.

By far the larger number of courts in this country hold that the statute of frauds does not apply to a contract which has been fully executed on one side within a year, where nothing remains to be done on the other except the payment of money. The cases are collected in the annotation, 6 ALR2d 1053 at 1111 and 27 CJ 357, note 18, Statute of Frauds § 436. The rule is thus stated in 27 CJ, supra: "But when a contract has been so far performed that nothing remains to be done but the payment of the consideration for the performance, the fact that the contract does not require the payment within a year furnishes no defense to an action for the price." This interpretation of the statute appears to have been first announced in England in 1832: *Donellan v. Read,* 3 B & Ad 899, 23 ECL

---

[1] ORS 41.580 provides in part: "In the following cases the agreement is void unless it, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party to be charged, or by his lawfully authorized agent; evidence, therefore, of the agreement shall not be received other than the writing, or secondary evidence of its contents in the cases prescribed by law: (1) An agreement that by its terms is not to be performed within a year from the making."

On the trial the parties stipulated that the contract sued on is an Oregon contract. We, therefore, treat it as governed by Oregon law.

391, 110 Reprint 330, 6 ERC 298. There a landlord sued his tenant for rent, in addition to that stipulated in the lease, which the tenant had agreed to pay in consideration of improvements to be made on the premises by the landlord and which had been made within the year. Under the terms of the agreement, however, payment was not to become due until more than a year after the agreement was made. Littledale, J., said:

> "As to the contract not being to be performed within a year, we think that as the contract was entirely executed on one side within a year, and as it was the intention of the parties, founded on a reasonable expectation, that it should be so, the Statute of Frauds does not extend to such a case."

This doctrine has met with disfavor among some of the courts of this country and was criticized with marked ability by Chief Justice Redfield in *Pierce v. Estate of Paine,* 28 Vt 34 (1855), quoted at length in Browne on the Statute of Frauds (5th ed) 381, on the ground that it virtually disregarded "both its [the statute's] terms and all the beneficial objects of its adoption." The recovery, it was said, in cases where the party not bound to perform within a year has accepted the performance or such performance went to his benefit, "is not upon the contract, but upon the *quantum meruit* or *valebat,* or upon money counts." See, also, *Marcy v. Marcy,* 9 Allen (Mass) 8; *Broadwell v. Getman,* 2 Denio (NY) 87; 2 Williston on Contracts (Rev ed) 1472.

But the courts which subscribe to the majority view, while acknowledging the force of the argument against it, nevertheless take the position that the very fact that recovery may be had in *quantum meruit* or *valebat,* and that the contract may be shown in such an action as evidence of the worth of services or the value of

goods, is a potent reason for adhering to the doctrine of *Donellan v. Read.* This view is well expressed in *Durfee v. O'Brien,* 16 RI 213 (1888), where the court, after quoting from *Pierce v. Estate of Paine,* said:

"* * * While this statement is logical, and, aside from the consideration of authority, might be satisfactory, it is evident that the real difference between this case and those opposed to it is the form of pleading. If the recovery be upon a *quantum meruit* count, still the contract is admissible as evidence to show what the defendant admitted and declared the consideration to be worth, and to show the nature and extent of the benefit conferred. 1 Smith's Lead. Cas. 7th Amer. ed. 588. Now under the English rule that amount is fixed and determined by the contract, and under a *quantum meruit* it may also be the same amount; but in the latter case it is possible that one may use the statute as a means of depriving another of the stipulated price for which he let his property go; or, on the other hand, he may be compelled to pay for it more than he agreed to give. The inequity of either result is a strong reason against the adoption of a rule that might lead to it. Another reason given in support of the English rule in these cases is, that, inasmuch as the contract is not executory except as to the matter of payment, or recovery back of the consideration, as to which a clear right of action exists, such cases are not within the mischief which the statute is designed to prevent, and therefore not to be construed as within the operation of the statute. While such a proposition is by no means unanswerable, there is, nevertheless, a wide distinction between a case where one seeks to enforce a verbal contract more than a year after it was made, when witnesses to its terms may have died, or from lapse of time have lost their clear recollection of executory stipulations, and a case where one simply seeks to recover payment for a benefit received. In the latter case the question comes down to a recovery upon a count on the con-

tract, or upon *quantum meruit* with the contract admissible as evidence. Since recovery on the contract may, as we have seen, be sustained upon reason, and is supported by the weight of authority, we think it is the better rule to follow." 16 RI 216-217.

Like reasoning is to be found in *Emerson v. Universal Products Co.*, 18 Del Ch 189, 156 A 786; *Diamond v. Jacquith*, 14 Ariz 119, 125 P 712, LRA 1916D 880; *McClellan v. Sanford*, 26 Wis 595.

Today the rule that the statute does not apply to oral contracts fully performed on one side within a year is accepted by the courts of at least 26 jurisdictions in this country.[2]

It has also drawn to itself the weighty support of the American Law Institute Restatement. Some of the courts limit the application of the rule to cases of executed contracts where all that remains to be done on the other side is the payment of money. But the Restatement, Contracts § 198, contains no such limitation. It reads:

"Where any of the promises in a bilateral contract cannot be fully performed within a year from

---

[2] Rake's Adm'r v. Pope, 7 Ala 161; Diamond v. Jacquith, 14 Ariz 119, 125 P 712, LRA 1916D 880; Norton v. Steinfeld, 36 Ariz 536, 288 P 3; Dean v. Davis, 73 Cal App2d 166, 166 P2d 15; Emerson v. Universal Products Co., 35 Del 277, 162 A 779; Curtis v. Sage, 35 Ill 22; Rinehart v. Shedd, 207 Ill App 139; Piper v. Fosher, 121 Ind 407, 23 NE 269; Saum v. Saum, 49 Ia 704; Andregg v. Sparrow, 152 Kan 744, 107 P2d 739; Kinser v. Bennett, 163 Kan 725, 186 P2d 284; Dant v. Head, 90 Ky 255, 13 SW 1073, 29 Am St. Rep 369; Holbrook v. Armstrong, 10 Me 31; Bjornstad v. Northern States Power Co., 195 Minn 439, 263 NW 289; Bird v. Bilby, 202 Mo App 212, 215 SW 909; Blue Valley Creamery Co. v. Consolidated Products Co., (CCA 8th) 81 F2d 182 (applying Missouri law); Pountaine v. Fletcher, 158 Miss 720, 126 So 471; Besse v. McHenry, 89 Mont 520, 300 P 199; Kendall v. Garneau, 55 Neb 403, 75 NW 852; Berry v. Doremus, 30 NJL 399; Dennis v. Thermoid Co., 128 NJL 303, 25 A2d 886; Olson v. McQueen, 24 ND 212, 139 NW 522; Franks v. Reeder, 101 Okla 18, 223 P 126; Durfee v. O'Brien, 16 RI 213, 14 A 857; McLellan v. McLellan, 131 SC 245, 126 SE 749; Lampert Lumber Co. v. Pexa, 44 SD 382, 184 NW 207; Reed & McCormick v. Gold, 102 Va 37, 45 SE 868; Maze v. Feuchtwanger, 106 Wash 327, 179 P 850; Smith v. Black, 100 W Va 433, 130 SE 657; McClellan v. Sanford, 26 Wis. 595; Stewart v. McKeon, 36 Wyo 106, 252 P 1024; In re Little River Lumber Co., 92 Fed 585; Marston v. Downing Co., 73 F2d 94 (CCA 5th) (applying law of Georgia under special statute). In Texas the decisions are not in harmony. See 6 ALR2d 1118.

the time of the formation of the contract, all promises in the contract are within Class V of § 178 [contracts not to be performed within a year], unless and until one party to such a contract completely performs what he has promised. When there has been such complete performance, none of the promises in the contract is within Class V."

Turning now to our own decisions, this court has held that, where labor and services are performed for another under an oral contract not to be performed within a year, recovery may be had in an action upon *quantum meruit* and the contract is admissible in evidence. *McGilchrist v. F. W. Woolworth Co.*, 138 Or 679, 7 P2d 982; *Keller v. Bley,* 15 Or 429, 15 P 705. Similarly, in an action in assumpsit to recover money paid it was held that, even though an action upon the contract could not be maintained, evidence of the contract could be received "to show what the defendant admitted and declared the consideration to be worth." *Bowman v. Wade,* 54 Or 347, 102 P 72. *Webster v. Harris,* 189 Or 671, 222 P2d 644, and *Hearn v. May,* 207 Or 514, 298 P2d 177, held that the oral contracts therein involved were void and unenforceable because not to be performed within a year, but in neither case was there full performance on one side. But in *Brown v. Austin,* 102 Or 53, 201 P 543, and *In re Woodward's Guardianship,* 173 Or 96, 144 P2d 490, oral agreements to pay money after the expiration of one year were held to be incapable of enforcement, although there had been full performance on the other side. Neither the briefs nor the opinions in these cases referred to the split in the authorities on this question.

*Bowman v. Wade,* however, expressly approves the majority, or, as it is sometimes called, the "one side" rule. *Emerson v. Universal Products Co.,* supra. The

plaintiff in *Bowman v. Wade* sued to recover money borrowed by the defendant under an agreement that the amount should stand as a loan for three years, and should be secured by a mortgage on real estate, and alleged that, due to the defendant's fraud, the mortgage had never been given. The court, in an opinion by Mr. Justice SLATER, said "that the decided preponderance of authority is in favor of the validity of a parol contract which has been fully performed upon one side at or near the time of its making, although the execution thereof by the other party is deferred for a longer period than one year: Smith, Law of Fraud, § 352." The court quoted with approval from the opinion of Chief Justice Dixon in *McClellan v. Sanford,* supra, supporting that construction of the statute, and stated that "on principle and weight of authority the contract now under consideration is not within the statute." It was further held, however, that, even though within the statute, the plaintiff could recover, not upon the contract, but for money had and received, and, as above stated, that the contract could be admitted in evidence. In *Great Western Land Co. v. Waite,* supra (a case which did not involve a contract not to be performed within a year), Mr. Justice BURNETT, in an opinion denying a petition for rehearing, said with reference to *Bowman v. Wade* that the construction there "was limited to cases where the stipulation sought to be enforced related solely to the payment of a money consideration," and "the principle is restricted to the recovery of cash considerations already paid." It is to be observed, however, that, although *Bowman v. Wade* was an action to recover a cash consideration already paid, the rule there approved is not limited to such cases, for the language

which the court quoted with approval from *McClellan v. Sanford* includes the following:

> "It will be observed, on examining these cases, that in some the question was nearly identical with the present, except that the promise was not evidenced by anything written in the deed, and that in all it was held that a verbal promise to pay beyond the year, if made upon an executed consideration, *whether lands conveyed or goods and chattels sold and delivered, or other consideration of value, is valid. The doctrine of these cases is that the provision of the statute now being considered applies only to contracts not to be performed on either side within the year.*" (Italics added.)

■ In view of this decided preponderance of authority and what we regard as the practical advantages to be gained by following the majority rule[3], we hold that the agreement here in question, having been fully performed on the part of the plaintiff, is not within the one-year provision of our Statute of Frauds.

■ (2) Nor is the agreement, as the defendant contends, within Subdivision 6 of ORS 41.580, which reads "An agreement concerning real property made by an agent of the party sought to be charged unless the authority of the agent is in writing." This provision was a part of our original Statute of Frauds as adopted in 1862. Deady's Code, p 264. The agreement in question here is not one "concerning real property" in the sense of the statute. It is an agreement concerning the payment of a commission, contingent, it

---

[3] "We should therefore support the majority courts, even though they may have been directed by instinct rather than by logic, and even though they may have actually modified the statute of frauds, since the rule they apply reaches its result directly and without enforcing the contract by allowing it to be proved as if for another purpose; it offers a uniform remedy to all claimants without regard to the accidental destination of the consideration given; and it reduces the field in which the statute operates inharmoniously with modern conditions." 2 Corbin on Contracts, p 581.

is true, on the purchase of real property by the defendants, but in no way binding anyone to sell or purchase any interest in real property. If such an agreement was within the Statute of Frauds it would not have been thought necessary to enact what is now Subdivision 7 of ORS 41.580 regarding real estate brokers.[4]

A real estate broker's contract of necessity has to do with real estate, but not until the 1909 amendment was such a contract subject to the Statute of Frauds. See *Flegel v. Dowling*, 54 Or 40, 102 P 178, 135 Am St Rep 812 (1909). As we shall now show, however, the agreement here is not even a real estate broker's contract.

■ (3) The agreement does not fall within Subdivision 7 of ORS 41.580, which is set out in Footnote No. 4, supra. The undertaking of the defendant was to pay $50,000 to the plaintiff as a "commission or finder's fee." So far as the writing goes it was conditioned upon the defendant buying "the assets of the Blue River Sawmills, Ltd. at any price which may be negotiated." The plaintiff, to whom the owner had agreed to pay a commission of $50,000 in the event of a sale to any of certain prospective purchasers, agreed for a like consideration to allow the defendants to conduct their own negotiations, and this is what actually occurred. The defendants went directly to the owner and made their own deal, ignoring the plaintiff until the time came to close the deal. So far from being

---

[4] This section, originally enacted as Oregon Laws 1909, ch 27, now reads: "An agreement authorizing or employing an agent or broker to sell or purchase real estate for a compensation or commission; but if the note or memorandum of the agreement is in writing and subscribed by the party to be charged, or by his lawfully authorized agent, and contains a description of the property sufficient for identification, and authorizes or employs the agent or broker to sell the property, and expresses with reasonable certainty the amount of the commission or compensation to be paid, the agreement shall not be void for failure to state a consideration."

an agreement to authorize an agent "to sell or purchase real estate," this was an agreement on the part of the defendant to pay a commission to the plaintiff for refraining from acting under that authority.

The case is like *Kincart v. Shambrook,* 64 Or 27, 128 P 1003 (1913). There the plaintiffs, who were engaged in the real estate business, had for sale a tract of land and had found in one Roberts a prospective purchaser. Knowing this, the defendant, who owned a farm which he desired to trade, offered orally to pay the plaintiff's $850 "for their said customer" in the event that he should consummate a trade of his farm and an apartment house owned by Roberts. The plaintiffs, in consideration of this offer, broke off their negotiations with Roberts, and the defendant succeeded in making a trade of his farm for Roberts' apartment house. The plaintiffs sued the defendant for the promised consideration and recovered a judgment, which was affirmed on appeal over the objection that the agreement, being oral, was void under LOL § 808 (8), now ORS 41.580 (7). The court, speaking through Mr. Chief Justice McBride, said:

"While the question before us is not without difficulty, we do not think that the agreement is within the section of the statute quoted above. There was no agreement by plaintiffs to trade, or attempt to trade, Shambrook's land for Roberts' house. The plaintiffs had found in Roberts a prospective customer for their 480 acres of land, and Shambrook, learning that Roberts was disposed to trade for land in that vicinity, was willing to pay $850 if plaintiffs would forego their chances to make such a trade, and give him an opportunity to trade his land instead. He did not stipulate for any active effort on the part of plaintiffs further than to sell him their chances. They owed him no duty to even recommend the trade, and, if they did so, such

action was voluntary on their part, and did not make them brokers or agents for Shambrook. Under the agreement, they had no authority to sell or trade, and the evidence indicates that beyond ceasing their efforts to trade their own property they did nothing except to introduce the parties and state Mr. Shambrook's desires in the matter. It is possible, and even probable, that if they had declined Shambrook's proposal, and had actively pressed the trade they were negotiating for the 480 acres, they might have succeeded in closing it. It was a prospect of some possible value, and they had a right to contract for compensation for relinquishing it."

In the case at bar we are concerned with the same general character of agreement. Mrs. Wolfe met Watkins in Vancouver on March 31 or April 1, 1954, in the capacity of a broker representing Blue River. As the result of the agreement of April 1, 1954, she (and through her the plaintiff) shed that role as far as the defendants were concerned. The sum of the matter is that the plaintiff gave up his chances of collecting a $50,000 commission from Jones in favor of the prospect of collecting a like commission from Shroyer and Watkins. We see no distinction between the present case and *Kincart v. Shambrook,* and hold, therefore, that the agreement is not within the real estate brokers' provision of the Statute of Frauds.

*The Oregon Securities Law*

■ For the reasons just stated, we find no merit in the defendant's contention that the plaintiff violated the Oregon Securities Law by engaging in the sale of stock as agent or broker without complying with the registration and permit provisions of that law. See ORS 59.010 et seq.

■ It is convenient at this point to take note of an

assignment of error directed to the court's ruling in admitting in evidence the contract of purchase and sale between Jones and Mr. and Mrs. Shroyer. The argument is that, inasmuch as the plaintiff has declared on an agreement for the payment of a commission contingent on the sale of assets, proof of a sale of corporate stock constituted a variance. We think that this contention is a mere quibble. The substance of the matter is that Shroyer got what he was after—the timber owned by the corporation. So far as his obligation under the agreement with the plaintiff is concerned, the form which the transaction took, whether it was a deed from the corporation or a transfer of corporate stock, is immaterial. It may have been important to Jones, as affecting his tax liability, or simply a question of convenience, but it is without bearing on the liability of the defendant to the plaintiff. The point is well illustrated by Watkins' answer to the question by Shroyer's counsel whether he ever told Shroyer that "there was any matter involved here about purchasing stock instead of timber." Watkins answered:

"Well, I doubt if I did. In other words, I was buying the timber. As far as my thinking was concerned, it was incidental whether it was stock or trees we was buying because stock represented trees and we were both in a terrible tizzy. He had irons in the fire and so did I and I doubt if I ever went into detail to tell him that this was actually purchase of stock rather than a purchase of land."

*Watkins' Authority*

The defendant contends that there is no evidence that Watkins was authorized to execute the agreement of April 1, 1958.

In our opinion, even though there was no agency

in the beginning, there was evidence sufficient to warrant the jury in finding that the defendant ratified Watkins' act.

 The rule in this state upon this subject is that, if a principal, when fully notified thereof, neglects promptly to disavow an act or contract of his agent in excess of his authority, such silence will usually be interpreted as an implied ratification, and particularly so if the failure speedily to repudiate such conduct or agreement might impose upon the other party loss or injury. *Hansen v. Bellman,* 161 Or 373, 387, 88 P2d 295; *Depot Realty Syndicate v. Enterprise Brewing Co.,* 87 Or 560, 575, 170 P 294, 171 P 223, LRA 1918C 1001; *Reid v. Alaska Packing Co.,* 47 Or 215, 220, 83 P 139; *Curtze v. Iron Dyke Mining Co.,* 46 Or 601, 606, 81 P 815. Ratification and equitable estoppel are to be distinguished. Acts and conduct amounting to an estoppel *in pais* in some instances amount to a ratification, but, on the other hand, ratification may be complete without any element of estoppel. *Depot Realty Syndicate v. Enterprise Brewing Co.,* supra, 87 Or at 576; 1 Mechem on Agency (2d ed) § 454. As further stated in the *Depot Realty Syndicate* case, 87 Or at 574:

> "When oral declarations are made by a party in the presence and hearing of his adversary who is under no restraint and conscious of the charge thus imputed, asserting against him an obligation which might be enforceable, or his commission of an offense, or limiting his title to property, or affecting him injuriously, it is reasonable to suppose he would promptly deny such positive declarations, if he desire to escape unfavorable inferences which might be deduced from his silence, and hence he is usually required hastily to refute such charges: 16 Cyc. 958."

The rule is thus set forth in the Restatement, Agency § 94:

"An affirmance of an unauthorized transaction may be inferred from a failure to repudiate it."

Appended to the foregoing are the following comments:

"a. Silence under such circumstances that, according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent, is evidence from which assent may be inferred. Such inference may be drawn although the purported principal had no knowledge that the third person would rely upon the supposed authority of the agent; his knowledge of such fact, however, coupled with his silence, would ordinarily justify an inference of assent by him. Whether or not such an inference is to be drawn is a question for the jury, unless the case is so clear that reasonable men could come to but one conclusion."

"c. If a third person, who has had dealings with a purported agent, reports these to the purported principal under circumstances which reasonably justify an inference of consent unless the principal discloses his dissent, the failure of the principal to dissent within a reasonable time is, unless explained sufficient evidence of affirmance."

■ Under these principles, which are well settled, it seems to us that it was for the jury to say whether Shroyer was silent when he should have spoken, and whether his failure to disavow the agency amounted to ratification of Watkins' act. As must have been known to him and the others present, the plaintiff and Mrs. Wolfe were admitted into the conference in Hamilton Read's office for the single purpose of presenting their claim for a commission. There could have been nothing casual about their statements. The subject of their demands had already been a matter

of negotiation between Jones and Shroyer. The purchase price of Blue River corporate stock had been reduced $50,000 because Jones was to be relieved from payment of the plaintiff's commission. Watkins, who signed the agreement of April 1, 1954, was present, and, as the record discloses, if he was only a "timber scout" when he first met Mrs. Wolfe, he had since become a negotiating agent for Shroyer. Not only did he bargain with McIntyre about the deal over the long distance telephone in Shroyer's home, but he went to British Columbia ahead of Shroyer early in May, presumably at the latter's direction, and met with McIntyre and Jones in Victoria "to lay the ground work for this contract", as he testified. It is not only Shroyer's silence after the agreement of April 1 was read that is important. It is also of major significance that he heard Johnson read the plaintiff's letter agreeing to pay the former $5,000 "out of closing moneys received" for "professional services rendered," and heard Jones' statement that he had an agreement from Shroyer and Watkins "by which they have assumed and agreed to pay this $5,000 direct to me," and heard Watkins say, "Yes, that's right." Obviously this payment of $5,000 was to be made out of the plaintiff's commission, and it must have been so understood by Shroyer. The testimony is that Johnson referred to an agreement with Shroyer and Watkins, not an agreement made by the latter on behalf of the former. Shroyer repudiated neither Johnson's statement nor Watkins' confirmation of it. An agreement on Shroyer's part to pay this money *directly* to Johnson could carry the implication that but for that agreement Shroyer was obligated to pay it to the plaintiff. The legitimate inference from the testimony is that Shroyer had taken over the plaintiff's debt to John-

son as part payment of the commission he owed to the plaintiff. There is no evidence that Shroyer attempted to disaffirm Watkins' agency until several days later when, after consulting counsel, he put his refusal to go through with the agreement signed by Watkins on the ground, not that Watkins was unauthorized, but that his agency was not in writing, thus adding to the strength of the inference to be drawn from his silence at the May 10 meeting.

It is argued that the evidence of ratification is not sufficient because it is not shown that Shroyer was aware of all the facts, and, in particular, that he did not know what was the consideration for the agreement of April 1, 1954. Perhaps there is no direct evidence that he had such knowledge. But "There is a broad field for legitimate inference by a jury" from facts like those shown by the evidence in this case. *Reid v. Miller,* 205 Mass 80, 85, 91 NE 223. The jury, we think, were not bound to accept the denials of Shroyer and Watkins that the latter never told the former of the agreement with the plaintiff. As stated in 2 Am Jur 360, Agency § 454, in a somewhat different connection:

> "\* \* \* Moreover, notwithstanding the alleged principal and agent are the only witnesses called, and they both categorically deny the existence of the relation, the jury have the right to weigh and consider the whole of the evidence and the fair and reasonable inferences that might be drawn therefrom, and they may be entirely justified in disregarding the 'yes or no' answers and in reaching the conclusion that the evidence as a whole is sufficient to prove the relation of agency to exist."

We will briefly review the facts. Before the present transaction Shroyer and Watkins had been associated together in purchases of timber and in one mining

venture. On April 1, 1954, Watkins executed the agreement upon which this action was based. On April 13 (a fact not heretofore mentioned) Watkins sent from Corvallis a telegram to the plaintiff reading as follows:

"WE FLY DIRECT KAMLOOPS THURSDAY SHROYER WILLING TO PUT UP EARNEST MONEY IF NECESSARY BUT WILL MAKE OWN NEGOTIATION WITH OWNER NOT THROUGH AGENT. YOU ARE PROTECTED BY YOUR COMMISSION CONTRACTS EXPLANATION IN LETTER."

On April 15 Shroyer and Watkins went to British Columbia for the purpose of inspecting the Blue River timber. On April 22 the plaintiff wrote Jones and McIntyre reminding them that they had theretofore discussed the agreement of Shroyer and Watkins to pay the commission "and their offer to you will be a net offer without considering commissions." On May 4 came the telephone conversations in Shroyer's home in Philomath (which is six miles from Corvallis where Watkins lives) between Watkins and McIntyre, and the ensuing telegrams of that date. Two or three days later Watkins went to Vancouver to resume the negotiations, stopping in Portland to see the plaintiff and Mrs. Wolfe and communicate to them Shroyer's suggestion of a change in the terms of payment of the commission and to tell them of the May 10 meeting for the purpose of closing the deal. Finally, a purchase price was agreed on which represents a deduction of $50,000 because of the commission element, and a contract was drawn and executed containing Shroyer's agreement to indemnify Jones against the plaintiff's claim to a commission.

The jury were asked to believe that, of all the interested parties, Shroyer was the only one who did not

know of the April 1 agreement, and that Watkins, his trusted agent and business associate, either wilfully or carelessly withheld that important piece of information from him. They were asked to believe that, although both Watkins and McIntyre knew of the April 1 agreement at the time they talked over the telephone on May 4, the subject of a commission was never mentioned. They were asked to believe that the contents of a telegram sent to the agent, in response to a telegram sent by the agent at the direction of the principal, were not truthfully reported by the agent. Further, they were asked to believe that, although the commission was a subject of discussion at the meeting in Read's office and Watkins, Jones, McIntyre and Johnson, who were present, knew about the agreement of April 1; and, although Watkins, and probably the others, knew that the plaintiff and Mrs. Wolfe had come to Vancouver and were waiting to present their claim, still the agreement of April 1 was never mentioned. It is almost as though there was a conspiracy of silence organized against the man who, along with Jones, was most concerned.

When all these circumstances are considered in the light of the knowledge that Shroyer did in fact negotiate directly with Jones, as Watkins stipulated with the plaintiff that he might, and that he agreed with Jones to take over the latter's obligation to pay the plaintiff's commission, we think that it was competent for the jury, having in mind the normal manner in which men act, to infer that Shroyer knew what his agent knew and with that knowledge ratified the agreement.

There is much to be said for the view that the evidence justified a finding that Watkins was authorized in the first instance to enter into the agreement

sued upon. That issue was submitted to the jury by the court in its charge without exception on the part of the defendant. But the sufficiency of the evidence of ratification is so clear that we have been content to limit our decision to that phase of the question of agency.

We think that none of the reasons urged in support of the motion for a directed verdict are valid, and that the motion was properly denied.

*Other Assignments of Error*

■ Error is assigned to the court's action in overruling the defendant's demurrer to the plaintiff's first further and separate reply and in denying defendant's motion to strike such reply from the record. The challenged pleading is too long to be set forth here. Apparently, it is an attempt to plead ratification of Watkins' act combined with an estoppel. The complaint contains a plea of ratification in general terms, which is all that was necessary, if, indeed, any such plea was required at all. *Mahon v. Rankin,* 54 Or 328, 343, 102 P 608, 103 P 53. The only reference to the first affirmative reply in the instructions of the court was that it "in substance alleges a ratification of the acts on the part of the defendant Shroyer, that would bind—that is, claimed it would bind Shroyer to the alleged contract made by Watkins."

■ It was certainly unnecessary, and probably improper, to plead ratification in the reply, although a similar procedure in *Mahon v. Rankin,* supra, was not expressly disapproved. But the error, if any, in the rulings complained of was harmless, for the court in its charge submitted nothing to the jury other than what the plaintiff was entitled to have submitted under the allegations of the complaint.

 The defendant assigns as error the admission in evidence of Plaintiff's Exhibit A, a photostatic copy of the agreement signed by Jones to pay the plaintiff a $50,000 commission for effecting a sale of Blue River. The exhibit was objected to because no proper foundation was laid for the admission of secondary evidence under ORS 41.640 (b) or of a photostatic copy under ORS 41.720. Technically the objection was well taken. But this is not an action on the contract between plaintiff and Jones. Other evidence was received without objection of the contents of Exhibit A. See *State v. Folkes,* 174 Or 568, 608, 150 P2d 17. The ruling was not ground of reversal.

 There was no error in admitting in evidence the telegrams dated May 4, 1954. It is true that they did not constitute a contract. But they were relevant, as already shown, upon the questions of Watkins' authority, Shroyer's knowledge, and ratification.

 The court withdrew from the consideration of the jury the allegations of the defendant's second further and separate answer, which alleged in substance that the plaintiff and his agent, Mrs. Wolfe, failed to comply with the Real Estate Agents' Licensing Act. Rev Stat of British Columbia (1948), ch 189. The provisions of the Act were proved and non-compliance therewith conceded. This failure is plead as matter in bar. Whatever materiality the fact may have, it cannot be held to be a defense to this action which is stipulated to be brought upon an Oregon contract.

The defendant requested and the court refused to give the following instruction:

"I instruct you that if you find there was a total failure on part of plaintiff in this case to make inquiry of defendant Shroyer concerning the extent of the authority of defendant Watkins to act

for Shroyer, such failure would not amount to the exercise of reasonable care and prudence or due diligence on part of plaintiff, but to the contrary would be inconsistent with the exercise of reasonable prudence."

The ruling is assigned as error. The court instructed fully, and, as the defendant concedes, correctly upon the duty of one dealing with an agent to exercise ordinary prudence and reasonable diligence to ascertain the extent of the agent's authority. See, *Phez Co. v. Salem Fruit Union,* 113 Or 398, 429, 233 P 547; Mechem, op cit, § 752. Among other things, the court told the jury:

"A principal will not be bound by an act of his agent in excess of his actual authority, where the third person has knowledge of the extent of the agent's authority, or where the facts and circumstances of the case are such as to put him upon inquiry as to the authority and good faith of the agent, as where a third person deals with an agent who is acting for himself as well as for his principal in the transaction, as such a person is chargeable with a knowledge of such facts as a proper inquiry as to the agent's powers would have revealed to him. As a general rule, every person who undertakes to deal with an alleged agent is put upon inquiry, and must discover at his own peril that it is in its nature and extent sufficient to permit the agent to do the proposed act, and that its source is traceable to the will of the alleged principal."

■ Inasmuch as the evidence disclosed that the plaintiff made no inquiry of anyone as to the extent of Watkins' authority, we think that the instructions given adequately covered the subject, and refusal to give the requested instruction does not constitute reversible error. If the jury followed the court's instructions—and it must be assumed that they did—

then it must be concluded either that they found that Watkins had actual authority to sign the agreement on behalf of Shroyer or Shroyer afterward ratified it. Under that view instructions on the subject of diligence in ascertaining Watkins' authority became immaterial.

 It is contended that the court committed reversible error in reading three times to the jury during the course of its instructions the agreement of April 1, 1954, signed by Watkins. While needless repetition in instructions is to be avoided, we cannot say, after a careful reading of the entire charge, which was necessarily long, that the court gave such undue prominence to the agreement as to affect prejudicially the defendant's case.

The instructions as a whole were marked by fairness and impartiality.

The record discloses no reversible error and the judgment is affirmed.