LARKIN, *Respondent,*
*v.*
APPLETON, *Appellant,*
APPLETON et al, *Defendants,*
KRONSTEDT et ux, *Respondents.*
548 P2d 499

*Monte C. McKeehen,* Eugene, argued the cause and filed briefs for appellant.

*Keith Rodman,* Eugene, argued the cause and filed a brief for respondent Larkin.

DENECKE, J.

**DENECKE, J.**

The plaintiff buyer brought this suit against the defendant seller, Jean Appleton, to rescind a contract to purchase a motel. The ground for rescission was that the seller, through her agent, misrepresented the past income of the motel. The seller counterclaimed for foreclosure. The trial court held for the plaintiff and the seller appeals.

The crucial issues are: Did the real estate salesman act as agent for the seller in making the misrepresentations or did the seller ratify the contract which plaintiff entered into because of the agent's misrepresentations?

The facts are complicated and the issues perplexing.

In September 1972 the defendants Kronstedt operated the motel. They are not parties in the appeal. At that time a real estate salesman, O'Byrne, employed by Bill Hay, Inc., a Portland real estate broker, called on the Kronstedts. They led him to believe they were the owners and signed a real estate listing agreement authorizing O'Byrne and Hay to sell the motel for them.

A form, provided by O'Byrne, was filled out with the purported monthly income for the motel from January 1972 through September 1972. The trial court found O'Byrne filled in the figures and knew they were false. O'Byrne advertised that the motel was for sale and on November 10, 1972, the plaintiff inquired about the possible purchase. At that time O'Byrne gave plaintiff the data sheet with the false income figures and went over them with her. The next day plaintiff went to Eugene to visit the motel and talked to the Kronstedts. Plaintiff learned that the Kronstedts were not the owners but were operating under a lease-option agreement with the owner, Mrs. Appleton. The plaintiff informed O'Byrne that Mrs. Appleton was the owner.

[ 673 ]

O'Byrne contacted Mr. Appleton who acted as agent for his wife. Mr. Appleton stated they were willing to sell at the price fixed in Kronstedt's option agreement. Mr. Appleton expressly stated they would pay no commission, that O'Byrne and Hay were not authorized to act as their agents, and their attorney in Eugene, Max Ingerson, was to act on their behalf. Mr. Appleton agreed that if O'Byrne could raise the purchase price $10,000 Mrs. Appleton would pay him the $10,000 so received as a commission.

The plaintiff came to O'Byrne's office on November 19, 1972. O'Byrne prepared an earnest money agreement and on that date plaintiff signed it and deposited $5,000 earnest money. Two days later the document was tendered in Portland to Mrs. Appleton for signature. She refused to sign until it had been approved by her attorney. O'Byrne finally persuaded her to sign that part of the agreement stating the seller agreed to sell. It was agreed that this was not to be effective until her attorney approved. She also signed that part of the agreement by which she contracted to pay O'Byrne a commission. However, per her instructions, O'Byrne wrote above that agreement, "as per agreement attached hereto, and a part hereof." A proposed agreement was attached thereto which provided for payment of the proceeds to various parties and a commission to O'Byrne.

Her attorney advised Mrs. Appleton not to sign this agreement and she never did. The plaintiff does not contend Mrs. Appleton was bound by the earnest money agreement but that it aids in explaining the entire transaction.

Mrs. Appleton's attorney drafted closing documents for the sale, including an agreement of sale. The closing contemplated an escrow from which encumbrancers and others would be paid. Mr. and Mrs. Appleton deposited in escrow a promissory note in the amount of $10,080, payable to Bill Hay, Inc. (the real estate broker). Mrs. Appleton's attorney prepared the note.

The escrow instructions signed by Mrs. Appleton instructed the escrow agent to pay this note to Bill Hay, Inc., at the rate of $300 per month from the monthly payments received from plaintiff.

The parties "closed the deal" on December 18, 1972, and the plaintiff went into possession. In addition to the $5,000 earnest money, the plaintiff paid an additional $20,000 into escrow at the closing. She paid the monthly installments due through the May or June installment.

In March or April 1973 the plaintiff became aware that the representations of monthly gross income made to her by O'Byrne were probably incorrect. The plaintiff remained in possession until July 1973 when the court appointed Mrs. Appleton receiver of the property.

The trial court found Mrs. Appleton and plaintiff were "personally innocent of wrongdoing." The trial court concluded:

"Bernard O'Byrne acted as agent first for Jack and Thaddea Kronstedt and then for Jean Appleton.

"Bernard O'Byrne perpetrated actual fraud upon Genevieve Larkin [plaintiff], thereby inducing her to purchase the Manor Motel.

"Jean Appleton and Jack and Thaddea Kronstedt benefited economically from the deceptions of O'Byrne.

"In equity, Jean Appleton and Jack and Thaddea Kronstedt cannot retain these benefits.

"Genevieve Larkin is entitled to rescission. * * *."

Plaintiff's contentions are that Mrs. Appleton granted O'Byrne both actual and apparent authority to represent the past monthly income of the motel. Stated differently, plaintiff contends O'Byrne made misrepresentations when acting as Mrs. Appleton's agent. She also contends that Mrs. Appleton ratified O'Byrne's actions.

First, as to whether O'Byrne was Mrs. Appleton's agent when he made the misrepresentations, plaintiff

[ 675 ]

testified that O'Byrne did not appear to know that Mrs. Appleton was the owner until plaintiff told him on November 12. O'Byrne also so testified, then changed his testimony and said he had met with Mr. Appleton the last part of October to discuss sale of the motel. Plaintiff does not urge acceptance of this testimony of O'Byrne. We find from the evidence that O'Byrne was unaware of Mrs. Appleton's existence until November 12.

The income figures were shown to plaintiff on November 10 and discussed at that time. Plaintiff took the figures home and further studied them. At this time there was no figure for the gross income for October 1972. Plaintiff testified that after November 12th she was in O'Byrne's office. At that time he called someone and inserted the supposed October 1972 gross income. The October figures were also proved to be false. When this occurred is not definitely established. Plaintiff testified it occurred before November 19th, the date on which she signed the earnest money agreement. We find from the evidence as a whole that this misrepresentation of the October 1972 figures occurred before there was any basis for a finding that O'Byrne was acting as Mrs. Appleton's agent.

Our finding is supported by the position plaintiff's attorney took at trial. When plaintiff's attorney was questioning his client he tried to establish that the telephone conversation when O'Byrne obtained the October figures was with Kronstedt. The trial court sustained an objection to a question asking to whom O'Byrne was talking. Plaintiff's counsel attempted to have the court reverse its ruling by arguing that at this time O'Byrne was acting as Kronstedt's agent but later acted as Appleton's agent.

■ We find that no misrepresentation was made to plaintiff during the period when O'Byrne may have been acting as Mrs. Appleton's agent. The trial court made no finding on this issue.

Assuming, but not deciding that O'Byrne became Mrs. Appleton's agent subsequent to his making the misrepresentation, we also conclude she did not ratify his prior acts.

Ratification is the affirmance of an unauthorized act professedly done on the principal's account. Restatement (Second), 210, Agency § 82; Sell, Agency 49, § 61 (1975); *Phillips v. Colfax Company, Inc.,* 195 Or 285, 296, 243 P2d 276, 245 P2d 898 (1952). Ratification can be accomplished by the retention of the proceeds of an unauthorized transaction. Restatement (Second), 252, Agency § 98; Seavey, Agency, 71, § 38 (1964). This principle appears to be one basis for the trial court's decision. In order for the retention of the proceeds to act as a ratification, however, it must be when the principal acts "with knowledge of all relevant facts * * *." *Seavey, supra,* at 73. Sell states: "At the time of ratification, the purported principal must be aware of all the material facts concerning the existence and the extent of the obligations created by the transaction." *Sell, supra,* at 54, § 67. We accepted this requirement in *Alldrin v. Lucas,* 260 Or 373, 381, 490 P2d 141 (1971), and *Phillips v. Colfax Company, Inc., supra* (195 Or 285).

As plaintiff admits, Mrs. Appleton was not aware that O'Byrne had made misrepresentations to plaintiff until June 1973.

This rule that a retention of the proceeds after knowledge of the unauthorized action by the person purporting to act as agent amounts to a ratification is subject to another condition. Retention will not constitute a ratification if the principal has changed her position before becoming aware of all the relevant facts.

Seavey stated this proposition: "If the principle has acquired title to the property, as he would if it was obtained by an unauthorized collateral promise, and changes his position before learning of the facts, since

his retention of possession was not tortious, and it would now be unfair to require its return, his retention after learning the facts does not constitute ratification of the transaction by which it was obtained." *Seavey, supra,* at 74.

Restatement (Second) Agency, 256, § 99, states the proposition more broadly: "The retention by a purported principal, with knowledge of the facts *and before he has changed his position,* of something which he is not entitled to retain unless an act purported to be done on his account is affirmed * * * constitutes an affirmance [ratification] * * *." (Emphasis added.)

Seavey cites, among other decisions, *Massachusetts Bonding & Ins. Co. v. Pittsburg P. & S. Co.,* 135 SW2d 818 (Tex Civ App 1940), for this proposition. *Seavey, supra,* at 74. In that case the bank brought an action against the Supply Company to recover the amount of a forged check which the bank had honored. One Wair offered to buy material from Supply Company. Supply Company's agent contracted to sell Wair material for a price of $4,500. The terms were $1,500 down and the balance on credit. Wair tendered the agent a check ostensibly drawn by Church. The space for the payee was blank. The agent filled in the payee blank with the word, "cash," endorsed the check, received the proceeds for Supply Company and delivered the materials to Wair. Supply Company retained the funds after it learned the check was a forgery.

The court held the agent was not authorized to fill in the name of the payee. The contention was made that Supply Company ratified its agent's unauthorized act by retaining the money after it learned of the forgery and its agent's participation. The court held, however:

"But there are other facts to be taken into consideration in determining the liability or nonliability of the Supply Company in this case. It received and retains $1,500 of the proceeds of the money wrongfully obtained from the Bank. However, it seems beyond dispute that it

[ 678 ]

has changed its position since the receipt of such sum. After the receipt of this money it furnished Wair the machinery and supplies covered by the contract. The evidence seems to indicate that this was done before it had any notice as to the wrongful acquisition of this money by Wair or Futoransky [the agent]. If it is to be held, it must be held under the doctrine of ratification by retention of the $1,500.

"* * * * *.

"If after the commission of an unlawful act by an agent from which the principal receives benefit, but before having notice thereof, the principal has so changed his position that it is inequitable to require him to return the proceeds, there is no ratification by the retention of the benefits. * * *." 135 SW2d at 824.

■ In the present case, Mrs. Appleton substantially changed her position before she learned of O'Byrne's misrepresentations.

At the time Mrs. Appleton entered into the contract of sale with plaintiff, Mrs. Appleton was buying the motel. We have not found the terms of her purchase contract in the many exhibits; however, she was obligated for and was making substantial payments. The motel was under lease to the Kronstedts and Mrs. Appleton was paying her obligations with the payments from the Kronstedts. In addition, they had paid Mrs. Appleton $12,000 for a lease option. The option price was the same net price for which she had agreed to sell to plaintiff.

Mrs. Appleton received none of the cash from the $25,000 plaintiff paid down. Approximately $11,000 from this amount was paid Kronstedt in repayment of the amount they had paid Mrs. Appleton. About $12,000 was paid to persons from whom Mrs. Appleton was purchasing the motel. The balance was paid for attorney fees incurred by Mrs. Appleton in connection with the sale and for taxes, insurance, etc.

Plaintiff made the monthly payments required by the contract to Mrs. Appleton through June 1973.

[ 679 ]

These totaled approximately $10,000. At least $9,000 of this amount was paid by the escrow agent to persons from whom Mrs. Appleton was purchasing the motel.

The trial court entered judgment for plaintiff against Mrs. Appleton for the entire amount plaintiff paid, $36,000. Plaintiff was given a lien for this amount on the motel. The decree ordered that if the amount was not paid within 60 days the motel was to be sold and if it could not be sold, to be foreclosed. In either event, the plaintiff was to be paid her judgment after the costs of the sale or foreclosure were paid.

■ Plaintiff contends Mrs. Appleton cannot raise the defense of change of position because she did not plead it. Assuming such a defense ordinarily must be pleaded, that was not necessary in this case because plaintiff had not pleaded ratification by retention of benefits or proceeds. The trial proceeded as if both theories had been pleaded.

Plaintiff further contends: "Plaintiff, too, has changed her position to her great detriment" and "in this suit, based upon fraud, change of position can[not] be used as a shield to frustrate the doing of equity."

This principle that a retention of proceeds acts as a ratification unless the retainee has changed her position is based upon the law of restitution.

> "* * * In most of the cases the relief given is the same as if the basis were restitution and it is the principle of unjust enrichment which primarily motivates the decisions. Nevertheless the language may be that of ratification and in some cases the relief given is not restitutionary." *Seavey, Agency, supra,* at 73.

Section 142 of the Restatement of Restitution states, in part:

> "(1) The right of a person to restitution from another because of a benefit received is terminated or diminished if, after the receipt of the benefit, circumstances have so changed that it would be inequitable to require the other to make full restitution.

"(2) Change of circumstances may be a defense or a partial defense if the conduct of the recipient was not tortious and he was no more at fault for his receipt, retention or dealing with the subject matter than was the claimant." Restatement, Restitution, 567.

Neither plaintiff nor Mrs. Appleton were personally at fault in this transaction. However, if the evidence was only that Mrs. Appleton received substantial benefit from the fraud of O'Byrne, plaintiff should prevail. This rule "* * * is based upon the equitable principle that one should not benefit from the fraud of another, at least when the other is, or purports to be, his agent." Restatement (Second) Agency, 564, § 259.

However, when Mrs. Appleton changed her position before learning of O'Byrne's misrepresentations, the equities shifted. Now it is impossible to place the parties in the position they were in before they entered into the transaction. If Mrs. Appleton is required to make restitution to plaintiff, Mrs. Appleton will be substantially damaged. If plaintiff does not secure restitution, she will be substantially damaged. In such circumstances the law will not intrude to favor either innocent party.

Reversed and remanded.