Argued and submitted November 12, 1993, as to all parties other than Jacob
Burstyn, affirmed on appeal and on cross-appeal March 9, 1994

# Nazario PARAGANO,
## Jacob Burstyn, Jesse S. Weissberg
## and Monroe Markovitz,
*Appellants - Cross-Respondents,*

*v.*

# John D. GRAY,
## George H. Killian and Edward L. Allis,
*Respondents - Cross-Appellants.*

(9105-03260; CA A75511)

870 P2d 837

Robert D. Bulkley, Jr., argued the cause for appellants - cross-respondents. With him on the briefs were David B. Markowitz and Markowitz, Herbold, Glade & Mehlhaf, P.C.

Thomas V. Dulcich argued the cause for respondents - cross-appellants. With him on the briefs for respondents - cross-appellants Gray and Allis were Peter A. Ozanne and Schwabe, Williamson & Wyatt. With him on the briefs for respondent - cross-appellant Killian was Stephen J. Doyle.

Before Rossman, Presiding Judge, and De Muniz and Leeson, Judges.

De MUNIZ, J.

## De MUNIZ, J.

This is a declaratory judgment action involving a personal guaranty from plaintiffs to defendants of obligations arising from the 1986 sale of the Benj. Franklin Financial Center in Portland (the Center). The central dispute is whether the guaranty is for $1 million, as plaintiffs claim, or for $3 million, as asserted by defendants. Following a three-week trial, the jury found that there was a guaranty for $3 million and that plaintiffs were entitled to a $1 million setoff of that amount. Both parties appeal.[1] We affirm on the appeal and on the cross-appeal.

Plaintiffs Paragano, Burstyn and Weissberg are New Jersey real estate investors, and plaintiff Markovitz is a New Jersey lawyer who specializes in real estate transactions and also invests in real estate. They are four of the five partners[2] who formed Franklin Financial Associates (FFA), a New Jersey general partnership, to purchase the Center from defendants,[3] who are real estate investors located in Oregon and Washington. In 1986, the Center was the headquarters of the Benj. Franklin Savings & Loan Association (Benj. Franklin), the largest savings and loan in Oregon, which leased the entire building.

The parties were brought together for the deal by Levine, a Florida broker. The sale of the Center closed in December, 1986, for $31.5 million, $4.5 million of which was paid in cash at closing. Defendants arranged underlying permanent bank financing for $27 million with United States National Bank of Oregon (USNB). Under that financing, defendants were the primary obligors. To obtain the financing, defendants Gray and Killian personally guaranteed $7 million to USNB. Plaintiffs, in turn, personally guaranteed to defendants FFA's performance of its obligation to purchase the Center from defendants. The amount of that guaranty is the issue.

---

[1] By order dated February 28, 1994, we held the appeal in abeyance as to plaintiff Jacob Burstyn, who has filed a petition seeking relief under Chapter 11 of the United States Bankruptcy Code.

[2] The fifth partner is not a party to this action.

[3] The original seller was to have been the Madison Group, defendants' limited partnership, which owned the Center. The transaction was eventually structured so that defendants personally made the sale.

The sale did not proceed without complications. For tax purposes, the deal had to close by December 31, 1986. In the first two weeks of December, FFA and defendants reached an agreement that was written into a Property Purchase Agreement (PPA). The PPA required the individual partners of FFA to guaranty up to $1 million of the note to be issued on the balance. Because of the approaching holidays, all of the FFA partners intended to be on vacation at different times between December 15 and 31. Consequently, at a meeting around December 15, plaintiffs each signed a number of blank signature pages and left the pages with Markovitz to be attached to the guaranty. At about that time, Markovitz's office sent Weiner, attorney for defendants, a check for the $1.5 million earnest money. On December 22, Markovitz hired Janik as local counsel for FFA.

About December 22, Killian learned that USNB would not provide the financing unless defendants personally guaranteed $7 million. Gray told Killian that he would not guaranty that amount unless the partners of FFA increased their individual guaranty to $3 million. Then, sometime between December 24 and 27, Gray decided not to proceed with the deal. There were negotiations, but, about 10 a.m. on December 29, Weiner and Markovitz agreed that the deal was dead, and Markovitz asked Weiner to return the $1.5 million earnest money. Weiner did so. About an hour later, Gray changed his mind and agreed to go forward with the deal if, among other conditions, the FFA partners would agree to a $3 million personal guaranty. Killian testified that at about noon he received a telephone call on his mobile phone from Markovitz, who informed him that he would agree to change the guaranty. Killian told Weiner. Markovitz denied making the phone call. Weiner testified that he believed that he had confirmed Killian's statement with Markovitz.

Weiner and Killian arranged for the execution and delivery of the closing documents, but the documents did not go to New Jersey and return to Portland before the closing, which took place on December 30. The closing documents included one of the signature pages that plaintiffs had signed, attached to the $3 million guaranty.[4] Janik saw that guaranty before the closing.

---

[4] Everyone who might have attached the signature pages denied having done so.

No completed guaranty in the amount of $1 million exists. Janik's files concerning the transaction contained a marked-up version of a guaranty in which the "1" in $1 million was changed to a "3," along with other handwritten changes consistent with the final $3 million guaranty. Markovitz testified that he regularly makes notes of various sorts on draft documents and that he "may well have" made the changes during a telephone conversation with Levine.

The copy of the December 30 closing documents that was sent to Markovitz also included the $3 million guaranty. Markovitz was on vacation when the documents arrived, and they were filed by his secretary. Markovitz testified that he usually does not review documents after a transaction closes. In 1987, the accountant for the partnership learned of the $3 million guaranty by talking to the secretary and listed each partner's share of the guaranty in the partnership tax returns. Plaintiffs testified that they did not understand that their tax returns reflected the $3 million guaranty.

In 1990, the Resolution Trust Company (RTC) declared that the Benj. Franklin was insolvent and took control. As a result, in the spring of 1991, FFA lost the tenant of the Center. In September, 1990, Paragano first learned that the tenant loss might occur, and he reviewed the sale documents at that time. He and Markovitz testified that they were surprised and shocked at the discovery of the $3 million guaranty.

Some months later, FFA deeded the Center to USNB in lieu of foreclosure. Plaintiffs then brought this action seeking, *inter alia*, a declaration that the document purporting to be their personal guaranty of $3 million was void and that the maximum amount of any guaranty was $1 million. They also sought a declaration that, if the $3 million guaranty was valid, it had been reduced by $1 million, which was the amount that USNB had reduced defendants' personal liability to USNB. Defendants counterclaimed, *inter alia*, for collection of a $3 million guaranty.

■ In their first six assignments of error, plaintiffs assert that the court erred in its rulings relating to the Statute of Frauds. The court concluded that the parties had complied with the statute. It denied plaintiffs' motion for a

directed verdict and did not give plaintiffs' proposed instructions regarding the statute.[5]

ORS 41.580 provides, in part:

"(1)   In the following cases the agreement is void unless it, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party to be charged, or by the lawfully authorized agent of the party; evidence, therefore, of the agreement shall not be received other than the writing, or secondary evidence of its contents in the cases prescribed by law:

"* * * * *

"(b)   An agreement to answer for the debt, default or miscarriage of another."

Plaintiffs argue that there was no agent in Oregon authorized to attach the signature pages to the $3 million guaranty and that, therefore, the agreement was not subscribed by the parties to be charged; therefore, they contend, the agreement is void. Defendants argue that the court correctly ruled that, as a matter of law, the signature page that was affixed to the guaranty and signed by plaintiffs satisfied the statute. The parties also dispute whether the agreement comes within the statute. Assuming that the statute applies, we agree with the trial court that the requirements were met.

Plaintiffs concede that it usually is the role of the court to determine whether a writing meets the requirements of the statute, *Com. Credit Corp. v. Marden*, 155 Or 29, 62 P2d 573 (1936), but they argue that the general rule cannot apply here and that the jury must decide whether plaintiffs actually subscribed the document to which their signatures are attached.

Whether the signature page that plaintiffs admitted signing was legally sufficient to constitute the subscription of the guaranty is virtually the identical issue addressed by the court in *Com. Credit Corp. v. Marden, supra*. That case involved an action on a bond allegedly executed by sureties. The signatures of the sureties did not appear in the space provided for them below the body of the bond but were

---

[5] The exchanges between plaintiffs' counsel and the court show that, contrary to defendants' claim, plaintiffs preserved the error.

appended in an affidavit following the bond. The court held that the question of whether the bond satisfied the requirements of the Statute of Frauds was one of law for the court:

"In an action at law upon an alleged agreement within the statute of frauds it is the sole province of the court to determine from the writing constituting such agreement whether it meets the requirements of the statute, where the law provides, as it does in this state, that the agreement is void unless in writing and subscribed by the party sought to be charged and that no evidence of the agreement shall be received other than the writing itself. It is not for the jury to determine, under our statute, from evidence other than or in addition to the writing, whether the parties sought to be charged intended by attaching their signatures to a supplemental affidavit to subscribe their names to a bond." *Com. Credit Corp. v. Marden, supra*, 155 Or at 39.

The affidavit did not refer to the bond and was dated several days after the date on the bond. The court held that the Statute of Frauds was not satisfied.

As in *Com. Credit Corp.*, here the issue for the court was whether the writing satisfied the statute. The court concluded that plaintiffs had given Markovitz their signature pages and that those pages were attached to the $3 million guaranty at the closing. We cannot say that the court erred when it ruled that that writing satisfied the statute and that plaintiffs could not avoid the agreement on the ground that it did not comply with the Statute of Frauds. The court did not err in denying plaintiffs' motion for a directed verdict or in refusing to instruct the jury as to the Statute of Frauds.

■     Defendants argued that, even if plaintiffs did not authorize Markovitz or Janik to make the $3 million guaranty, they are bound by it because they later ratified it. Plaintiffs assign error to the court's instructions on defendants' theory of ratification as well as to the court's failure to give their requested instructions on ratification. The court instructed the jury:

"Ratification means that you find out about the unauthorized act of the agent and instead of saying, Hey, the agent was without authority; I want to cancel this transaction, you continue on in the transaction knowing of the unauthorized act of the agent and accept the benefits of the transaction. If you do that and it's to the detriment, causes

detriment to the other party because you didn't cancel it immediately, then you can find that the transaction was ratified and the person is bound to it.

"A person may be bound by his agent's unauthorized act if the person later ratifies or accepts that act. Ratification occurs when the principal, knowing of the act, neglects promptly to disavow the allegedly unauthorized act or contract of his agent. And a failure to promptly repudiate the act or agreement would reasonably be expected to impose loss or injury upon the party who relied upon the agent.

"In deciding whether a principal has ratified his agent's act, whether or not the agent had original authority to act for the principal, is immaterial. The principal ratifies the act when he accepts the benefits of the agent's action, fails to offer to return to the other party the benefits of the transaction, and fails to bring promptly legal action to nullify the transaction. Where a principal has knowledge of facts which would lead him to believe that his agent has exceeded his authority and the principal fails to investigate the situation, the principal cannot assert that lack of knowledge. Receipt of the benefits of the agent's act may be considered a ratification of the agent's act."

■ Ratification requires knowledge of the material facts and the intent to ratify. *Minniti v. Cascade Employers Assn,* 280 Or 319, 332, 570 P2d 1171 (1977); *Alldrin v. Lucas,* 260 Or 373, 381, 490 P2d 141 (1971).[6] Plaintiffs contend that the instructions failed to tell the jury those elements and, instead, told the jury that ratification "occurs" when the principal fails promptly to disavow the agent's act.

■ We review for abuse of discretion the court's choice between instructions. *State v. McDonnell,* 313 Or 478, 496, 837 P2d 941 (1992). For the chosen instruction to constitute reversible error, it must have prejudiced the aggrieved party when the instructions are considered as a whole. *Martini v. Beaverton Ins. Agency, Inc.,* 314 Or 200, 211, 838 P2d 1061 (1992). We will not reverse on the basis of an erroneous instruction unless we can fairly say that the instruction

---

[6] Plaintiffs contend that defendants had to show that plaintiffs "actually intend[ed] to ratify the unauthorized act." *Robertson v. Jessup,* 96 Or App 349, 352, 773 P2d 385, *rev den* 308 Or 331 (1989). We do not conclude that that language requires a different showing of intent than the Supreme Court's discussions, as, for example, in *Alldrin v. Lucas, supra,* on which we relied in *Robertson.*

probably created an erroneous impression of the law in the minds of the jury that affected the outcome of the case. *Waterway Terminals v. P.S. Lord*, 256 Or 361, 370, 474 P2d 309 (1970).

■ Considering the instructions as a whole, we find no abuse of discretion here. The instructions point out that a principal must have knowledge of the facts. Intent to ratify may be implied from the principal's neglecting promptly to disavow the agent's act. *See Kneeland v. Shroyer*, 214 Or 67, 328 P2d 753 (1958). The instructions regarding the failure "promptly to disavow" are based on *Kneeland*, wherein the court approved the rules from *Restatement of Agency* § 94 (1932):

" 'An affirmance of an unauthorized transaction may be inferred from a failure to repudiate it.

" '* * * * *

" 'c. If a third person, who has had dealings with a purported agent, reports these to the purported principal under circumstances which reasonably justify an inference of consent unless the principal discloses his dissent, *the failure of the principal to dissent within a reasonable time is, unless explained[,] sufficient evidence of affirmance.*' " 214 Or at 94. (Emphasis supplied.)

Plaintiffs argue, however, that, when the court told the jury that ratification means continuing in the transaction, it misdirected the jury's attention from ratification of the $3 million guaranty to the transaction as a whole. However, the $3 million guaranty did not exist in isolation from the transaction as a whole. The instructions did not preclude the jury from deciding that plaintiffs' actions were consistent with their claim of a $1 million guaranty and did not constitute ratification of the greater amount.

Viewing the evidence in the light most favorable to plaintiffs, it[7] shows, *inter alia* that: when Paragano found the guaranty in September, 1990, he talked with Killian about suing the RTC; Markovitz contacted Janik's partner about

---

[7] Defendants' evidence included: that Markovitz discussed the guaranty with Janik in December, 1986; that there were copies of the guaranty in Markovitz's files; that Janik's files contained a version of the $1 million guaranty with the "1" changed to a "3," probably in Markovitz's handwriting; and that plaintiffs' tax returns reported the $3 million guaranty.

representing plaintiffs against the RTC; plaintiffs' partnership sued the RTC; that plaintiffs continued to receive rent through the first part of 1991, tried to pursue claims for construction defects and received rent on the Center; plaintiffs transferred a landlord's lien on material left in the Center to USNB; and Paragano, on behalf of plaintiffs as his partners, attempted to lease the Center to USNB.

The instructions informed the jury that there must be evidence that plaintiffs knew the material facts and that intent to ratify could be inferred from certain actions that plaintiffs did or did not take. The instructions were adequate for the jury to decide whether plaintiffs timely repudiated the guaranty or whether they attempted to repudiate only when it was obvious that their investment would not be salvaged. The instructions did not give the jury an erroneous impression of the law that was likely to affect the outcome of the case.

■  Plaintiffs next assign error to the court's failure to give two jury instructions that it submitted regarding the PPA. We agree with defendants that plaintiffs failed to preserve their claim of error. Plaintiffs moved for a directed verdict on the ground that the PPA was in force, as a matter of law, and that it had not been modified in writing, as required by the PPA. The court denied the motion. Plaintiffs do not assign as error the court's ruling on their motion for directed verdict on that issue. Later, the following exchange occurred regarding instructions:

"THE COURT:   * * * I'm not going to give [plaintiffs' proposed jury instruction] 23.

"[PLAINTIFFS' COUNSEL]:   *We really aren't talking about the property purchase agreement any more, so I think the 23 and 24 series probably are precluded by your previous rulings.*

"* * * * *

"THE COURT:  I've ruled that the question of the modification of the property purchase agreement being in writing, I've ruled adversely against you on that.

"* * * * *

"And 26. Now this again refers to the property purchase agreement and I'm not going to give it." (Emphasis supplied.)

Plaintiffs took no exception to the court's failure to give their instructions. They contend, however, that they preserved their objection, because the instructions correctly state the law and relate to an issue on which the court gave no instructions. *See Garrett v. Olsen*, 71 Or App 93, 97, 691 P2d 123 (1984). An exception does not need to be taken to a court's failure to give a requested instruction. ORCP 59H. However, here plaintiffs did not request the instructions. Rather, the exchange between the court and plaintiffs' counsel shows that plaintiffs agreed that the court's refusal to direct a verdict on the PPA removed the issue from the case. Plaintiffs may not resurrect the issue on appeal after their acquiescence to its removal in the trial court.

■ Plaintiffs next assign as error the court's granting of defendants' motion *in limine* to limit evidence about plaintiffs' backgrounds and its ruling that defendants did not open the door to that evidence. Plaintiffs argue that they had "inherent credibility" problems with an Oregon jury because they were from New Jersey and have foreign names and because defendants are prominent in Oregon. Plaintiffs wanted to present evidence of "who they are," for example, that Burstyn came to this county as a displaced person.

We review the admissibility of this type of evidence for abuse of discretion. *Vander Veer v. Toyota Motor Distributors*, 282 Or 135, 146, 577 P2d 1343 (1978). The court permitted plaintiffs to testify generally about their backgrounds and extensively about their business backgrounds and accomplishments. There was no abuse of discretion in excluding testimony about their life stories. The court also did not err in ruling that defendants did not "open the door" with comments about Killian's local ties and Gray's military background. The statements were not extensive; one was in response to plaintiffs' questioning.

■ Plaintiffs' final assignment of error is that the trial court erred in excluding the expert testimony of Winkler, an active real estate developer and a member of the Oregon State Bar. He would have testified that, in his experience, attorneys and real estate investors do not review documents after closing. Plaintiffs claim that that testimony was directly relevant to counter defendants' arguments that the fact that the $3 million guaranty was in Markovitz's file from 1987

showed that plaintiffs knew about the guaranty and thus had either agreed to it or ratified it. Plaintiffs argue that, in excluding the testimony, the court improperly evaluated the facts, because it concluded that this was not an ordinary transaction.

█    A court should admit expert testimony when it is clear that the jury needs the help of an expert to find the truth and should exclude it when it does not. Between those extremes, the decision to admit the testimony is within the discretion of the court. *Yundt v. D & D Bowl, Inc.*, 259 Or 247, 259, 486 P2d 553 (1971). The court did not abuse that discretion here. It reasoned that this transaction was not ordinary, because Markovitz was a principal in the partnership, as well as the partnership's attorney, and was a business advisor, as well as a legal advisor. The jury heard Markovitz's testimony as to his customary practice with regard to reviewing documents and that he had not read the closing documents after they arrived at his office. Winkler's testimony was not indispensable to the jury's understanding of whether or not it was likely that the documents here were read.

█    We turn to defendants' cross-appeal from the denial of their motions to strike plaintiffs' affirmative defense and for a directed verdict. By affirmative defense, plaintiffs claimed that, if they were liable for $3 million, they were entitled to a $1 million reduction under the guaranty.[8] Defendants argued that the reduction clause in the guaranty is unambiguous and should be construed in their favor. The court concluded that the provision was ambiguous and submitted the issue to the jury.

The reduction clause provides:

"[Plaintiffs'] liability hereunder shall be released on a dollar-for-dollar basis with each dollar of [Defendants'] personal liability over FOUR MILLION AND NO 100 ($4,000,000.00) DOLLARS which is released by United States National Bank of Oregon, the financial institution providing underlying financing to [defendants]."

---

[8] Defendants filed motions to strike the defense, for summary judgment, for a directed verdict and for judgment notwithstanding the verdict, after the jury agreed with plaintiffs as to the setoff.

The reduction clause ostensibly sets out the method by which plaintiffs and defendants would allocate the benefit should USNB reduce the $7 million guaranty of defendants that USNB required. Plaintiffs procured a $1 million reduction in that amount by making several concessions to USNB.

■■■ The parties agree that construing a contract is generally a matter for the court. The intent of the parties is to be pursued if possible. ORS 42.240. In determining whether the contract is ambiguous, the court may consider evidence of the circumstances under which the agreement was executed or to which it relates. ORS 42.220.[9] The court is entitled to hear evidence before determining whether a contractual provision is ambiguous and is not required to decide the issue before trial. *Adams v. Knoth*, 102 Or App 238, 244, 794 P2d 796, *rev den* 310 Or 422 (1990). If the court determines that the contract is ambiguous, evidence may be admitted as to the intent of the parties, and the determination of the parties' intent then is a question of fact. *Timberline Equip. v. St. Paul Fire & Mar. Ins.*, 281 Or 639, 643, 576 P2d 1244 (1978).

We agree with plaintiffs that the reduction clause is ambiguous. The clause may be read to provide that plaintiffs are entitled to a dollar-for-dollar release of their liability when USNB releases any portion of defendant's liability if defendants' liability is over $4 million; on the other hand, the clause may be read to provide that plaintiffs are entitled to a dollar-for-dollar release of their liability only after USNB has released a total of $4 million.

Defendants argue that the court erred in concluding, as a matter of law, that the reduction clause was ambiguous, because the court failed to consider the circumstances and context in which the contract was made, ORS 42.220, and failed to give meaning and effect to all of the terms of the reduction clause. ORS 42.230.[10] Defendants argue that the

_____

[9] ORS 42.220 provides:

"In construing an instrument, the circumstances under which it was made, including the situation of the subject and of the parties, may be shown so that the judge is placed in the position of those whose language the judge is interpreting."

[10] ORS 42.230 provides:

"In the construction of an instrument, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been admitted, or to omit what has been inserted; and where

circumstances of the transaction show that only one construction of the clause is consistent with the clear intent of the guaranty — to protect and benefit defendants. They argue that the first $4 million of any release of their personal liability by USNB could only benefit them, because up to $4 million they had no recourse against plaintiffs. They contend that when the clause is viewed in the relationship of their liability to USNB and plaintiffs' personal liability to them, the clause is not ambiguous.

Plaintiffs argue that, after examination of the surrounding circumstances, there remain conflicting reasonable interpretations that show that the court was correct in asking the jury to determine the parties' intent. They reason that, because the guaranties are interrelated and plaintiffs could not owe more to defendants than defendants owed to USNB, any reduction of more than $4 million would necessarily reduce plaintiffs' liability under the $3 million guaranty. Plaintiffs contend that, under the correct interpretation, the reference to $4 million explains how the guaranties were stacked: The first $4 million was defendants' responsibility and anything beyond that amount was plaintiffs' responsibility.

Defendants argue that the only testimony in support of plaintiffs' interpretation was that of Janik about statements made by Weiner as to defendants' intent with regard to the reduction clause. Defendants contend that that was inadmissible extrinsic evidence that the court should not have considered, but they do not assign the admission of that testimony as error. When a provision of a contract is ambiguous, the court may receive oral evidence of the parties' intent in order to resolve the ambiguity. That evidence includes their negotiations — what one party said to another — although not their undisclosed thoughts or subjective beliefs. *Public Market Co. v. Portland*, 171 Or 522, 537, 130 P2d 624, 138 P2d 916 (1943). Here, Weiner, as defendants' attorney, drafted the reduction clause. He told Janik, FFA's attorney, that plaintiffs' $3 million would be the last $3 million to be paid and that, if USNB reduced the amount of the $7 million guaranty, plaintiffs' liability under the $3 million guaranty

---

there are several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all."

would decrease by the same amount. Weiner's statements were a clear expression of the intent of the drafter, communicated to an attorney who was involved in the transaction. They were relevant, not to create an ambiguity or to contradict the express language of the reduction clause, but to resolve the ambiguity that already existed. They support the court's action in submitting the issue of the parties' intent to the jury.

The circumstances surrounding the reduction clause do not show that the clause is unambiguous. The court did not err in submitting the issue to the jury.

As to all parties other than Jacob Burstyn, affirmed on the appeal and on cross-appeal.