Argued and submitted November 27, 2007, reversed and remanded with
instructions to enter order of specific enforcement of settlement agreement
and to consider plaintiff's claims for breach of contract and money had and
received July 9, 2008

John S. LEMLEY,
*Plaintiff-Appellant,*

*v.*

Lori C. LEMLEY,
*Defendant-Respondent.*

Washington County Circuit Court
C061498CV; A133577

188 P3d 468

George W. Kelly argued the cause and filed the briefs for appellant.

Andrew M. Rich argued the cause and filed the brief for respondent.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

ROSENBLUM, J.

## ROSENBLUM, J.

Plaintiff appeals from a judgment denying his claim for specific enforcement of a settlement agreement designed to resolve issues on appeal from the parties' dissolution of marriage. The trial court concluded that defendant was not bound by the agreement because it had been entered into by her lawyer without actual or apparent authority from defendant. Plaintiff contends, in part, that the trial court erred in declining to enforce the agreement, because defendant ratified the agreement by accepting the benefit of plaintiff's performance with full knowledge of the material facts. On *de novo* review, ORS 19.415(3), we conclude that defendant ratified the agreement and should therefore be bound by it. Accordingly, we reverse and remand.

We state the pertinent facts from the record.[1] When the parties divorced in 2003, the dissolution court awarded defendant certain real property. Plaintiff appealed the judgment of dissolution. On appeal, he was represented by attorney Jaye Taylor, and defendant was represented by attorney Cecil Strange. Strange also represented defendant in connection with claims brought by her former divorce attorney for payment of that attorney's fees.

Strange and defendant entered into a fee agreement on August 31, 2004, which stated that Strange would charge his customary hourly rate, which was "currently" $180. On October 19, 2004, Strange sent defendant a letter in which he agreed to continue to represent her in exchange for her agreement to pay his fee by selling a piece of real property (the "Laurelwood property"), if necessary.[2] When it became clear that defendant's former attorney was not interested in settling his claim, Strange presented defendant with a deed to sign so that the Laurelwood property could be sold and the

---

[1] Because defendant's and attorney Strange's relationship, *vis-à-vis* her attorney fee obligations to him, is important to the context of the issues on appeal, we set forth those facts in some detail, in addition to those more specifically relevant to the direct issues between the parties.

[2] Strange testified that defendant bought the Laurelwood property during the pendency of the divorce case. The property was not marital property and was not addressed in the dissolution judgment.

proceeds used to satisfy defendant's current and future obligations to Strange. Strange told defendant that the transaction created a conflict of interest and advised her to seek the opinion of another lawyer.[3] Defendant signed the deed transferring the Laurelwood property to Strange, and Strange sold the property in 2005.

We affirmed the dissolution judgment without opinion on December 21, 2005. When we issued our decision, plaintiff had obtained a judgment of contempt against defendant, and defendant had sales of real property pending in escrow for which plaintiff had filed notices of *lis pendens*.[4] Defendant needed plaintiff to release the notices of *lis pendens* in order to complete the sales and receive the proceeds. At the same time, plaintiff was contemplating seeking review in the Oregon Supreme Court, which would have caused defendant to incur additional attorney fees that she wished to avoid. Because each party had something the other wanted, they began to discuss settlement after the appellate judgment was entered.

Those discussions culminated in a letter agreement authored by Strange. Strange testified that defendant gave him the authority to enter into the agreement memorialized by the letter, although she did not sign a document to that effect. Under the agreement, plaintiff would be required to file a satisfaction of the contempt judgment, release his notices of *lis pendens*, forgo his appellate rights, and pay $168,000 to defendant. In return, defendant would be required to forgo seeking attorney fees from plaintiff and to convey title to a piece of real property. The letter provided:

> "Upon your assurance that [plaintiff] desires to settle this case by paying [defendant] $168,000, filing a full satisfaction of his judgment against her, and accepting title to

---

[3] Defendant testified that Strange "tricked" her into signing the deed as security, despite the fact that the letter advised her to seek counsel before agreeing to the transaction and despite the letter's statement that Strange was presenting the deed to defendant "to sign so this property may be sold."

[4] ORS 93.740(1) provides, in part:

"In all suits in which the title to or any interest in or lien upon real property is involved, * * * any party * * * may have recorded * * * a notice of the pendency of the action * * * [to notify] purchasers and incumbrancers[ ] of the rights and equities in the premises of the party filing the notice."

the 101 E Main, Gaston OR commercial building as presently encumbered, I obtained an extension of time for filing a petition for attorney fees until January 25, 2006. I understand [plaintiff's] first source of financing has fallen through but that he is not out of options. [Defendant], however, is unable to risk separate expenses for a protracted settlement negotiation or to delay her petition for attorney fees in the [C]ourt of [A]ppeals any longer.

"We have both looked at IRC Section 1041 and agree that [plaintiff] will accept the real property with the same basis that existed before [the] divorce. I understand that he cannot guarantee IRS treatment of the transaction, and I only insist that he commit to taking no adverse position that might upset [defendant's] claim to a tax free re-delivery of title to a former spouse to settle their divorce dispute within six years of the dissolution.

"In order to afford [plaintiff] the additional time he needs to finance this settlement, [defendant] will agree as follows:

"1.  [Plaintiff] must deliver an executed satisfaction of [the contempt] judgment to me by close of business on January 19, 2006. This shall serve as non-refundable earnest money for the settlement.

"2.  Both parties shall allow their rights in the [C]ourt of [A]ppeals and Oregon Supreme Court to expire. Thus [plaintiff] shall not file any petition for review and [defendant] shall not petition for attorney fees.

"3.  [Plaintiff] must deliver appropriate recordable documents to me by close of business on January 19, 2006 which will effectively release the effect of his notices of lis pendens. [The title company] should have advice about the form of such documents and I will share it with you.

"4.  [Defendant] agrees to execute a deed in favor of [plaintiff] for the 101 E. Main property upon receipt of $168,000 by close of business on [April] 17, 2006 and not to encumber the property in the meantime. She agrees further to remove all liens of her attorneys from the property. The parties recognize that the real property taxes on the property are paid by the tenant and agree to a pro-rata split of the rent payment for the period in which [plaintiff's] $168,000 payment is

made. [Defendant] represents that she knows of no encumbrances on the property other than for real property taxes and those of her attorneys.

"5. You or [plaintiff] will execute an acceptance of the settlement terms in this letter and deliver it to me by close of business on January 19, 2006. You may do so by signing this letter if you wish.

"6. [Plaintiff] acknowledges by accepting this settlement that any failure to pay [defendant] $168,000 by close of business on [April] 17, 2006 shall finally resolve all claims he made or could have made, whether known or not, regarding real properties awarded to [defendant] in their December 2003 judgment of dissolution.

"7. If [plaintiff] makes the $168,000 payment on or before close of business on [April] 17, 2006, the parties hereby release each other, together with their respective heirs and assigns, from all claims and causes of action, whether known or unknown, that were not decided in their December 2003 divorce decree and which do not arise from enforcement of that judgment."

Strange signed the letter and noted that he sent a copy to defendant by including "cc: client" at the end of the letter and writing "Faxed version sent to cl[ient]" on the first page. Strange faxed the letter to Taylor on January 17, 2006, who signed the agreement on behalf of plaintiff on January 19, 2006.

As required by the agreement, plaintiff provided a satisfaction of judgment and releases of his notices of *lis pendens* by January 19, 2006. Plaintiff also refrained from filing a petition for review in the Oregon Supreme Court, thereby allowing the time for seeking review to expire. Immediately after Taylor signed the agreement, plaintiff began working on financing the settlement. He "mortgage[d] to the hilt" to raise the $168,000 payment, which he made sometime in March. Strange put the payment in his client trust account, where it remained at the time of trial.

Defendant also acted in accordance with the agreement. Before plaintiff sent the releases on January 19, defendant asked Strange to arrange for plaintiff to send the releases directly to the title company, rather than sending

them to Strange as set forth in the letter; she sold the properties that had been subject to notices of *lis pendens* for a net profit of at least $70,000; and she refrained from seeking fees for successfully litigating the dissolution case in the Court of Appeals.

On February 1, 2006, after meeting with another lawyer, defendant went to Strange's offices, where she spoke to him for about 10 minutes. During that time, she mentioned Strange's "lack of written authority" for the settlement. When asked to clarify, she offered no details regarding Strange's lack of authority. Instead, she testified that she expressed concern about not receiving Strange's billing statements, and she arranged to pick them up from Strange on February 28, 2006. After reviewing the statements, she learned that Strange was not planning to refund any of the profits of the sale of the Laurelwood property, which she had deeded to him to secure payment of his fees, and that he was, instead, claiming that defendant owed him additional fees. She also apparently discovered that Strange had begun charging her an hourly rate in excess of $180. The ensuing dispute between Strange and defendant over Strange's fees had not been resolved at the time of trial.

On March 24, 2006, Strange sent defendant a letter enclosing a deed to the property at 101 E. Main Street for her to sign as part of the settlement agreement. The letter informed defendant that Strange had received most of the funds plaintiff was required to pay under the agreement, and Strange asked defendant to sign the deed so that it would be ready when plaintiff paid the final balance. He also discussed some of defendant's concerns about his fees and advised her to seek counsel for advice about his bill. He further advised defendant to speak to another lawyer "about dishonoring the settlement agreement," explaining that he "would be a witness in such a case and could not represent [her]."

At some point, defendant decided that she would not give plaintiff the deed to the property at 101 E. Main Street. Strange testified that, as late as March 24, defendant "would not answer my direct questions as to whether or not she was going to sign and return the deed that I had sent to her."

"About that time," which was "weeks or months after the settlement agreement," Taylor told Strange that defendant had called plaintiff and told him that she would not sign the deed. Defendant also told Strange that she would not follow through with her obligations to plaintiff until Strange forgave his attorney fees and released the $168,000 from his escrow account.

Plaintiff filed a complaint for specific performance seeking an order requiring defendant to convey the property at 101 E. Main Street to him.[5] He argued, among other things, that the contract should be enforced against defendant because she had accepted the benefit of his performance, which was clearly referable to the agreement. At trial, defendant testified that she never gave Strange written authority to enter into the settlement. Although she had seen the settlement agreement before the lawsuit was filed, "somewhere around possibly the end of February," she did not recall the precise circumstances under which she saw it. Defendant testified that she did not understand certain aspects of the settlement, specifically that she would forgo any entitlement to attorney fees under the agreement, because Strange "told me that, you know, he could do an extension."

After hearing testimony from plaintiff, Strange, and defendant, the court reluctantly ruled in favor of defendant:

"[Plaintiff] has done everything in absolute good faith * * * so I don't see any fault on this side of the room at all, none.

"On [the other] side of the room, in addition to Mr. Strange, I do see some fault with [defendant], and this is a situation where I do see that at best you in what can't be absolute good faith took advantage of the circumstances surrounding the end of the appeal process. Clearly that's what happened when you sold the properties. It just can't be explained any other way except you know that you're getting some advantage from whatever came out of the appellate process, and that has to be that you have some

---

[5] He also alleged claims for breach of contract and money had and received based on defendant's collection and retention of rent from the tenants of the property at 101 E. Main Street between February 2006 and the time the complaint was filed.

knowledge, some generalized knowledge at least of some terms of some agreement that was reached by somebody.

"That doesn't mean, however, that you had authorized Mr. Strange or you hadn't authorized Mr. Strange to make an agreement, as opposed to negotiate an agreement, and that's a very important distinction. And from my observations of Mr. Strange, I'm not at all satisfied that he in any way addressed any such distinction, and so I'm not at all satisfied that there was actual authority in Mr. Strange, that he had the ability not only to negotiate—which I think everybody agreed on he had the ability to negotiate—but also to actually agree to the terms of the settlement.

"* * * I don't think that there is an apparent authority case made out here, either, so this is one of those things that if I could do it, I'd take the $168,000 out of his account, give it to you, and I'd require you to sign the deed for him, and the world would be a better place, quite frankly, but I can't do that.

"And I—since I don't think there was authority, I have to deny the request for an order that you sign the deed.

"And I—every so often I don't like my job. Most of the time I do because I get to do what's right. On this particular occasion, I don't feel good. I think [plaintiff is not getting a fair shake], and I don't think [he] deserved it in these circumstances, and I'm sorry about that, but I can't—I have to do—I have to find the facts the way I see the facts, and I can't change that."

The court did not expressly rule on plaintiff's claim that defendant should be bound by the agreement because she had accepted the benefit of his performance. Instead, it entered a general judgment denying plaintiff's claims.

On appeal, plaintiff contends that the trial court erred by denying his request for specific performance and by finding that Strange lacked authority to settle the case on defendant's behalf. He argues that the evidence supports the conclusion that Strange had authority to enter into a deal with plaintiff, and, even if it does not, that defendant's conduct gave plaintiff reasonable cause to believe that Strange had the required authority. Plaintiff also contends that defendant ratified the agreement. We need not address whether Strange possessed actual or apparent authority to

bind defendant to the settlement agreement because we conclude that, in all events, defendant subsequently ratified it by her conduct.

■ Ratification by a principal of a previously unauthorized contract by an agent requires evidence that the principal, with knowledge of the material facts, intended to ratify the contract. *Minniti v. Cascade Employers Assn*, 280 Or 319, 332, 570 P2d 1171 (1977); *Alldrin v. Lucas*, 260 Or 373, 381, 490 P2d 141 (1971). Ratification occurs when a principal either manifests assent to be bound or engages in conduct indicative of consent by the principal. *Restatement (Third) of Agency* § 4.01 (2006). "For example, knowing acceptance of the benefit of a transaction ratifies the act of entering into the transaction. This is so even though the person also manifests dissent to becoming bound by the act's legal consequences." *Id.* at § 4.01 comment d; *see also id.* at § 4.01 comment g.

■ We first consider whether defendant possessed the requisite knowledge of the material facts of the transaction. A fact is material to the choice to ratify an agent's unauthorized act if it "concern[s] the existence and the extent of the obligations created by the transaction." *Larkin v. Appleton*, 274 Or 671, 677, 548 P2d 499 (1976) (citation omitted); *see also Restatement* at § 4.06 comment c. As the trial court noted, it at least had to be the case that defendant had "some knowledge, some generalized knowledge at least of some terms of some agreement."[6] The evidence before us, both direct and circumstantial, supports the stronger conclusion that defendant had knowledge of the materials facts of the transaction when she accepted its benefits.

■ First, the agreement itself contains notations indicating that it was faxed to defendant and that she received a copy. Defendant did not testify otherwise; rather, she testified that she first saw the agreement "with everybody's signatures on it" "somewhere around possibly the end of February." She was not asked when she first saw the agreement *without* signatures.

---

[6] The trial court did not make findings regarding the extent of defendant's knowledge, concluding that, "since I don't think there was authority, I have to deny the request for an order that you sign the deed."

Second, and most important, Strange testified that defendant asked him to ask plaintiff to send the releases of the notices of *lis pendens* directly to the title company by January 19, two days after the date of the letter, in order to promptly close the sales of the properties subject to the notices. Defendant offered no evidence to the contrary. The fact that defendant asked that plaintiff send the releases directly to the title company demonstrates that she was aware of the agreement, which on its face required plaintiff to send the releases to Strange. We see no reason that defendant would give directives clarifying how plaintiff should perform under an agreement unless she knew of its terms.

Third, defendant testified that she spoke with another lawyer about Strange's lack of authority to enter into the agreement, as well as her fee dispute with Strange, around February 1. It is difficult to understand why defendant would consult with another attorney about Strange's authority to bind her to an agreement, or about the content of that agreement (including its effect on her obligation to pay attorney fees), if she was not aware that the agreement had been made or of the nature of its terms. Accordingly, we conclude that defendant was aware of the material terms of the agreement at the time or shortly after the letter was faxed to her by Strange.

Defendant contends that these facts cannot establish her knowledge of the material terms of the agreement because she did not understand its collateral effects on her attorney-fee dispute with Strange. More specifically, she contends that she did "not necessarily" understand, as of February 2006, that she had relinquished her right to petition for appellate attorney fees "because [Strange] told me that, you know, he could do an extension" of time to file a petition for attorney fees. Defendant's testimony on that point is not credible. First, as explained above, the evidence supports the conclusion that defendant saw the agreement before February 1. The agreement clearly states that defendant "shall allow [her] rights in the [C]ourt of [A]ppeals [to] expire" and "shall not petition for attorney fees." Second, defendant testified that she received a letter extending the deadline for her to file a petition for fees from January 11 to January 25. That testimony is inconsistent with her claim

that she believed she could still seek fees as late as February. Accordingly, we conclude that defendant knew that her ability to petition for attorney fees on appeal expired on January 25.

Defendant also argues that she was not aware that Strange intended to deduct his fees from the $168,000 payment. Even if we were to credit her testimony that she was not aware that Strange intended to collect his fees (which is in direct contradiction to Strange's testimony on the subject[7]) from the $168,000 payment, Strange's plan of action following completion of the contract was not a material fact "concerning the existence and the extent of the obligations *created by the transaction.*" *Larkin*, 274 Or at 677 (citation omitted; emphasis added). Defendant's obligations to Strange were not created by the settlement agreement between plaintiff and defendant; instead, they were created by the provision of Strange's professional services pursuant to the August 2004 fee agreement. We conclude that defendant possessed the requisite knowledge of facts material to plaintiff's and defendant's obligations created by the transaction, despite any misunderstanding that she may have had about the amount of fees owed to Strange or about how Strange intended to collect them.

We next consider whether defendant's conduct exhibited her intent to be bound by the agreement. The intent to ratify an agent's acts may be inferred from the principal's failure to repudiate or disavow them. *Paragano v. Gray*, 126 Or App 670, 678, 870 P2d 837 (1994). A principal's inaction or silence may ratify his agent's unauthorized act if a reasonable person would be expected to speak if she did not consent. *Kneeland v. Shroyer*, 214 Or 67, 94, 328 P2d 753 (1958). Here, after six years of court battles so contentious that she required medical leave for "[s]tress related to ongoing litigation," defendant was aware of the settlement agreement and accepted the benefit of plaintiff's performance under it without repudiating or disavowing it. Her failure to do so worked to plaintiff's detriment, as he allowed his time to petition for

---

[7] Strange testified that, by February 1, he and defendant "had discussed many times the fact that [plaintiff] was paying the estimated attorney fees for prosecuting the appeal as part of the settlement."

review in the Oregon Supreme Court to expire, filed a satisfaction of judgment, released his notices of *lis pendens* and any interests they protected, and mortgaged himself "to the hilt" to finance the settlement payment. A reasonable person, immersed in contentious litigation and knowing full well that the opposing party is acting to her benefit and to his own detriment by performing consistently with the terms of a settlement agreement, would speak or take other action if she did not expect to be bound by the agreement.

■      Defendant contends that there is no evidence that she accepted any benefit from the agreement. We disagree. The evidence shows that plaintiff had satisfied a judgment against defendant and had released his notices of *lis pendens* (permitting defendant to sell two parcels of real property for a profit of over $70,000) by January 19. The evidence also shows that plaintiff allowed his appellate rights to expire by January 25. In other words, as the trial court found, defendant had "[taken] advantage of the circumstances surrounding the end of the appeal process" by that time. Defendant makes much of the fact that the record lacks direct evidence of when those events occurred and when she became aware of them. The evidence is undisputed, however, that defendant asked Strange to have plaintiff send the releases directly to the title company by January 19. Thus, direct evidence establishes that she accepted the benefit of plaintiff's very significant performance under the agreement, at the very least with respect to the releases of notices of *lis pendens* by that date.

Defendant also argues that she acted to promptly disavow the agreement by raising the issue of Strange's lack of authority with Strange on February 1 and by calling plaintiff sometime thereafter to tell him that Strange lacked authority. However, defendant never testified that she called plaintiff to tell him that Strange lacked authority to enter into the agreement, let alone when such a call was made. Strange testified that Taylor told him "weeks or months after the settlement agreement" that defendant had told plaintiff that she would not sign the deed. Plaintiff confirmed that defendant called him at some point, but he could not recall when she called him.[8]

---

[8] Although plaintiff replied affirmatively when asked if defendant called him "at some point [to] tell you that there was no authority for this agreement," he later

Even if defendant raised the issue of Strange's authority when she called Strange on February 1, the preponderance of the evidence is that defendant still had not clearly repudiated the agreement with plaintiff by March 24. Strange's letter of that date advised defendant to seek other counsel "if" she wished to dishonor the settlement agreement, suggesting she had not clearly expressed her intention to do so. Strange also explained that, around the time he sent the letter, defendant "would not answer my direct questions as to whether or not she was going to sign and return the deed." In fact, Strange testified that he was not aware that defendant did not consider herself bound by the settlement agreement until after plaintiff filed suit.

We conclude that defendant remained silent under circumstances that would have prompted a reasonable person who did not expect to be bound to speak and that she manifested her assent to the agreement by failing to repudiate it before accepting the benefit of plaintiff's performance. Accordingly, the evidence supports the conclusion that she intended to ratify the settlement agreement.

Because defendant ratified the agreement, we treat the contract "as if done by an agent acting with actual authority" under the common law of agency. *Restatement* at § 4.01. However, defendant contends that the contract is, nevertheless, void pursuant to the "statute of frauds" because her agent's authority was not reduced to writing as required by the statute. *See* ORS 41.580(1); ORS 93.020(1) (permitting an agent to enter into a contract for the transfer of interest in real property on behalf of a principal only if the agent is "under written authority").

■■ An agreement that would otherwise be unenforceable because the agent failed to obtain written authority may be taken out of the statute's reach if the party seeking enforcement of the agreement establishes the elements of part performance. *See Mukai Living Trust v. Lopez*, 199 Or App 341, 345, 111 P3d 1150 (2005) (citing cases). In order to show part performance, a party must prove the following by a preponderance of the evidence: (1) that the agreement was

---

clarified that "[t]he only thing I recall is she called me, wanted me to go against my attorney for malpractice and go against her attorney for malpractice. That was the only conversation I had with her."

clear, certain, and unambiguous in its terms; (2) conduct that is clearly and unequivocally referable to the agreement; and (3) equitable grounds for enforcing the agreement.[9] *Id.*

The agreement at issue here was clear and unambiguous on its terms. Moreover, plaintiff's conduct in performing his obligations under the agreement was clearly and unequivocally referable to its terms. Plaintiff went from contentiously litigating against defendant, whom he testified that he did not trust, to releasing his notices of *lis pendens* and satisfying a judgment against her. That abrupt change in course can only be explained by the terms of the settlement agreement.

We are left with the question of whether equitable grounds exist for enforcing the agreement. We conclude that they do. Knowing of the agreement, defendant accepted the benefit of plaintiff's part performance, which ultimately resulted, among other things, in a profit to her of over $70,000. Having induced plaintiff to act to her benefit and to his detriment, defendant refused to perform her obligations under the agreement, which the trial court accurately characterized *at best* as "[taking] advantage" of the situation with which she was presented.

Defendant contends that plaintiff cannot show grounds for equitable enforcement of the agreement under *Coleman v. Parry Center*, 43 Or App 775, 604 P2d 424 (1979). In that case, a potential purchaser of real property brought an action for specific performance of a real property sales contract that had been entered into by the parties' attorneys. The defendant contested the enforcement of the contract under the statute of frauds, arguing that its attorney acted beyond the scope of his authority, of which the plaintiffs were aware. Although we declined to enforce the contract in *Coleman*, the facts of the present case are very different. Here, unlike in *Coleman*, plaintiff was not aware of any limitations on Strange's authority, and, also unlike in *Coleman*,

---

[9] Plaintiff urges us to consider whether the agreement is also enforceable under the doctrine of equitable estoppel. That doctrine is subsumed by the part performance exception, and we therefore do not give it separate consideration. *Mukai Living Trust*, 199 Or App at 348 (citing *Luckey et ux v. Deatsman*, 217 Or 628, 633, 343 P2d 723 (1959)).

defendant acted consistently with the proposition that Strange possessed full authority to bind her by accepting the benefits of plaintiff's performance. We conclude that equity requires that defendant be ordered to perform those obligations.

Because the trial court concluded that the settlement agreement was not enforceable, it did not consider plaintiff's claims for breach of contract and money had and received with respect to rent collected from the tenant of the property at 101 E. Main Street. On remand, the trial court should consider those claims.

Reversed and remanded with instructions to enter order of specific enforcement of settlement agreement and to consider plaintiff's claims for breach of contract and money had and received.